[L. A. No. 27850.   In Bank.   Aug. 11, 1964.]

ARTHUR W. HORN, Plaintiff and Respondent, v. ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, Defendant and Appellant.

John J. Balluff, Henry M. Moffat, Edward J. Riordan, Welsh & Cummins, J. H. Cummins and Robert W. Walker for Defendant and Appellant.

Boccardo, Blum, Lull, Niland, Teerlink & Bell and Edward J. Niland for Plaintiff and Respondent.

PEEK, J.—Defendant railway appeals from a judgment for plaintiff in an action for personal injuries brought under the Federal Employers Liability Act (45 U.S.C.A. § 51) and the Safety Appliance Act (45 U.S.C.A. § 2).

Plaintiff, who was 21 years of age and had been employed for several years by defendant, was working as a brakeman on a switch engine in defendant's yard at Blythe. He uncoupled a caboose from the engine, and as the engine pulled away he attempted to adjust the coupler in order that it would be in a condition to receive the next coupling. He stood on the rear footboard of the engine, and when the coupler would not respond to the control of the "cut" lever provided for that purpose he placed his left foot inside the coupler in an attempt to adjust it. The engine made an unexpected stop and the caboose, which unnoticed by plaintiff had been rolling forward, engaged the coupler before plaintiff could remove his foot therefrom. The foot was crushed and it was necessary to amputate it above the ankle.

Under the Federal Employers Liability Act defendant is not liable for any damages, and any assessment thereof is consequently illegal, except for "such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, and its . . . equipment." (45 U.S.C.A. § 51.) Similarly, the Safety Appliance Act, the other basis for defendant's claimed liability, provides that "It shall be unlawful for any common carrier . . . to haul . . . any car . . . not equipped with couplers . . . which can be uncoupled without the necessity of men going between the ends of the cars." (45 U.S.C.A. § 2.)

While defendant, by answer to the complaint, formally denied liability, its counsel nevertheless stated to the jury in his opening statement: "In spite of all this [the cir-

cumstances allegedly establishing absence of liability], ladies and gentlemen, I am not asking you for your verdict in favor of the Santa Fe Railway Company; I am going to ask you to pay him some money. I will, however, contend now and throughout the case and in my final argument, legally we don't owe the plaintiff a dime. Nevertheless, we want you to give him some money." Shortly thereafter defense counsel told the jury: ". . . we will ask you to find and give the plaintiff . . . $26,500.00."

During closing argument counsel for defendant further stated: "You have two possible verdicts under the law, one for the plaintiff and one for the defendant. You have one reasonable verdict under what I have told you, and that is a verdict for the plaintiff. I am asking you to bring in your verdict for the plaintiff, which will naturally carry costs of suit too." Plaintiff's counsel then asked defense counsel to repeat the latter statement, and defense counsel responded: "I said I was asking for a plaintiff's verdict at your hands which would naturally carry court costs. . . . I have sought and received authority to tell you to give the plaintiff $3,360.00 [for prosthetic equipment and supplies for the remainder of plaintiff's expected life] . . . and . . . $23,290.00 [to compensate for the injury] . . . ." Plaintiff's verdict was in the amount of $149,000.

Although defendant contends that certain errors were made in admitting testimony, over its objection, as to good custom and practice in opening couplers which failed to respond to the operation of the cut lever, and as to the meaning of certain of defendant's safety rules, such objections go to the question of defendant's liability and the only reasonable conclusion on the record presented is that defendant conceded its liability to the trier of fact. Defense counsel's unequivocal invitations to a plaintiff's verdict can only be construed, in legal significance, as a concession of liability under the Federal Employers Liability Act or the Safety Appliance Act or both of them, in spite of earlier formal denials of such liability. Counsel, by his own statement, was authorized to make such concessions and his client is bound thereby in the absence of fraud. (*Bank of America* v. *Lamb Finance Co.,* 145 Cal.App.2d 702, 708 [303 P.2d 86] ; *Scafidi* v. *Western Loan & Bldg. Co.,* 72 Cal.App.2d 550, 561-562 [165 P.2d 260].) In any event, on the record thus presented, we cannot conclude that, at least as to the issue of liability, the

claimed errors could have resulted in a miscarriage of justice.

As to the further contention that the award of damages is excessive, the only issue of any substance relates to defendant's claim of prejudicial misconduct in arguments to the jury on the part of plaintiff's counsel, Mr. James Boccardo. There were numerous items of claimed misconduct, the significant instances of which are set out below.

Defendant railroad brought into court and submitted as an exhibit the particular engine coupler which allegedly failed to operate for the plaintiff. There was repeated testimony that the coupler was identical in all respects as when removed from the engine except for markings on the component parts, and further testimony relative to the functioning of the particular coupler. Counsel for plaintiff, in comparing the exhibit with photographs of the coupler on the engine, noticed that the pin, a component part of the coupler, was different. He then drew out from defendant's witness on cross-examination that the pin had apparently been substituted. In commenting on the substitution, plaintiff's attorney remarked in his opening argument to the jury: "Where is the pin, by the way? Did some guy who knows something about railroading look at it and say, 'My God, all worn out,' and throw it in the scrap heap where it belonged? You be the judge. All of which shows you and gives you a taint. In other words, there is a paint brush on this case from the defense standpoint. Everything they contend for stinks. That's it—in plain language. Everything they have done. They sit up here with smiles and smirks. All they are trying to do is beat a poor kid with a leg off out of what they owe him. . . ." Counsel also told the jury that they had "seen the deceit practiced before them in this Courtroom. . . . ," and had "seen the lack of sincerity demonstrated in this Courtroom."

In further relation to the exhibit plaintiff's counsel suggested to the jury that a Mr. Dray (a mechanical engineer employed by the National Casing Company who appeared as an expert witness for defendant) had perjured himself: "Dray gets up here under oath" and after conceding that the pin had been replaced, "the next day they got to rehabilitate the situation. So Dray, he is ready to jump through the hoop—after all, they sell the Santa Fe, I don't know whether it is millions or billions dollars worth of these things every year—so whatever Santa Fe wants, we will give you. . . .

But the significance of those things are—the utter lack of care on the part of what they will say. In other words, say anything if it will suit the bill.''

Plaintiff's counsel also undertook to characterize the defendant's conductor as a perjurer in the following language: ''When he [the conductor, Mills] tells you that it is not custom and practice to open the thing with your foot when you are going away, he isn't telling you the truth. He is lying, you see, for the benefit of the Santa Fe because he knows and fears that his own conduct is in serious question in letting his daughter on the engine, and not passing the signals and doing all the things that he did that day. . . . What character of man is it who would lie to injure a man that he helped cripple for life? . . . Does it take courage to do what Mills did here? It doesn't take courage. It takes the kind of a soul, the kind of character that is despicable—that is what it takes.''

After accusations that the engineer's testimony was also untruthful, plaintiff's counsel cast the jurors in the same mold should they not agree with him: '' [W]e are going to discuss the elements that you are going to compensate for if you want to do the job as jurors under your oath. If you want to disregard your oath, disregard the law, disregard the facts, you have that privilege. You can be in the same boat as the Santa Fe—and live with yourselves for the rest of your days.''

Counsel additionally made remarks intended to disparage defendant without particular reference to specific testimony. Typical of such remarks were: ''Now I think that you are in an enviable position. I would like to be in the position some day of being on a jury, of having a meritorious case tried before me, of having the privilege of once seeing that an injured, crippled, handicapped amputee got what the law says he should have and not what some cheap, inconsiderate inhumane people might think he ought to have.'' Shortly thereafter he stated: ''I say this so emphatically because in my blood, in my veins runs something in this type of case that just nauseates me when I think of the inhumanity of men to men sometimes; this lack of realization of the dignity of man. . . . When they do it to a man and they destroy his ability to enjoy life—what's a hundred thousand dollars, for Heaven's sakes.''

In addition to the foregoing counsel for plaintiff made

further appeals to the emotions and sympathies of the jurors: "I am talking to you with this fundamental premise: I believe you to be human beings possessed of every human emotion that a human being possesses. I don't believe you are sadists. I don't believe you want to look for some reason why you are not going to give Mr. Horn what he is entitled to because on the contrary I think you are going to look upon it as desirous of doing all that you can do under your power as a human being possessed of the milk of human kindness to rectify what has happened to one of the finest young men it has been my privilege to know." Without any apparent relationship to factual matters before the jury counsel made the following appeal to the jurors' emotions: "In the old days of medicine, there is an interesting book that I have been reading recently, there was no anesthesia. They cut off a piece of a man's body—pulled out his tongue and put pincers on it and cut off a piece—no anesthetic; they had nothing; the blood squirted; they would take a big hot iron and sear it on there—sear it until the man yelled and screamed, and the agony was fantastic."

As to the computation of damages, counsel made these improper remarks: "I say to the devil with earning capacity for the time being; let's see what it is if you are just a housewife. Take one of ladies with no earning capacity and you got to do your housework on a wooden leg. You can't go dancing. You can't go swimming. And it's you, or somebody you love for the rest of your days, for fifty years; you don't have any trouble thinking about $150,000 as peanuts. . . . But when it is some poor wretch that doesn't belong to you, then you start thinking you are paying it out of your own pocket. You are not paying this out of your own pocket." On another occasion he stated: "Is there anybody on this jury who can honestly say, impartially say that they would sell their leg for one hundred thousand dollars if they never spent a minute of their time working forever more—then they are just different kind of people that I have known in the past. That is all I have to say. . . .

"Now let us figure out the damages. Let's take every element and discuss it and appropriately fix an amount—not some amount that we want to give somebody that we hated and detested. How much do we want to give somebody we love, somebody who is near and dear to us? How much would we want to get ourselves if we were in that kind of a

situation? Do it honestly, without any sympathy for him or the railroad.''

Aside from the substitution of the pins in the coupler exhibit there are no grounds for the abusive and prejudicial remarks directed at defendant and its witnesses by plaintiff's counsel, and such remarks were highly prejudicial. The numerous charges intended to gain the jurors' sympathies on the ground that defendant was calloused and inhumane, without regard for its employees' welfare, could only have been designed to unjustly prejudice defendant in the eyes of the jurors. (See *Jonte* v. *Key System*, 89 Cal. App.2d 654 [201 P.2d 562]; *Deibler* v. *Wright*, 119 Cal.App. 277, 282-283 [6 P.2d 344].) The remarks intended to play upon the emotions of sympathy, shock and horror were likewise improper matters for the jury to consider. (See *Woolworth Co.* v. *Wilson*, 74 F.2d 439, 443 [98 A.L.R. 681].) And finally, and most significantly in the circumstances of this case, it was improper to appeal to the jurors to fix damages as if they or a loved one were the injured party. In *Zibbell* v. *Southern Pac. Co.*, 160 Cal. 237, this court stated at page 255 [116 P. 513] : ''It is, of course, improper for the jury to attempt to measure the damage occasioned by the injury and the sufferings attendant upon it, by asking themselves what sum they would take to endure what plaintiff has endured, and must endure. . . . 'No rational being would change places with the injured man for an amount of gold that would fill the room of the court, yet no lawyer would contend that such is the legal measure of damages.' '' In *Chicago & N.W. Ry. Co.* v. *Kelly*, 84 F.2d 569, in a Federal Employers Liability Act case similar to the instant one the court stated at page 576 in reversing for improper and prejudicial remarks by plaintiff's counsel in his closing argument: ''It is unnecessary, we think, to go any further with the analysis of the argument of counsel for the plaintiff. He asked the jury to place themselves in the position of the plaintiff's mother or son or husband; a position which would have disqualified them to act as jurors.''

The sum result of counsel's remarks was such as to create an atmosphere of bias and prejudice which manifestly was calculated to deprive defendant of a fair trial. Certainly such conduct cannot be condoned. However we are nevertheless persuaded to the conclusion that defendant has waived

its right to complain by its failure to make timely objections, and the instant judgment should not be reversed.

At no time did counsel for defendant, an experienced trial attorney, interrupt plaintiff's counsel's opening or closing arguments to make objections as to the claimed instances of misconduct. Instead he elected to sit by while the improprieties accumulated until the conclusion of the closing argument, and then move for a mistrial. The motion was denied as was a motion for a new trial on numerous grounds, including plaintiff's counsel's misconduct.

■ Generally a claim of misconduct is entitled to no consideration on appeal unless the record shows a timely and proper objection and a request that the jury be admonished. (*Seffert* v. *Los Angeles Transit Lines,* 56 Cal.2d 498, 509 [15 Cal.Rptr. 161, 364 P.2d 337] ; *State Rubbish etc. Assn.* v. *Siliznoff,* 38 Cal.2d 330, 340 [240 P.2d 282] ; *Hicks* v. *Ocean Shore Railroad Inc.,* 18 Cal.2d 773, 787 [117 P.2d 850] ; *Cope* v. *Davidson,* 30 Cal.2d 193, 202 [180 P.2d 873, 171 A.L.R. 667].) ■ The purpose of the rule requiring the making of timely objections is remedial in nature, and seeks to give the court the opportunity to admonish the jury, instruct counsel and forestall the accumulation of prejudice by repeating improprieties, thus avoiding the necessity of a retrial.

■ "It is only in extreme cases that the court, when acting promptly and speaking clearly and directly on the subject, cannot, by instructing the jury to disregard such matters, correct the impropriety of the act of counsel and remove any effect his conduct or remarks would otherwise have." (*Tingley* v. *Times-Mirror,* 151 Cal. 1, 23 [89 P. 1097].) ■ In the absence of a timely objection the offended party is deemed to have waived the claim of error through his participation in the atmosphere which produced the claim of prejudice.

■ The motion for a mistrial in the instant case can hardly be deemed a timely objection as the claimed damage could not then be forestalled. Even then defendant did not request that the jury be admonished to disregard the alleged improper statements made by plaintiff's counsel.

Defendant relies on cases in other jurisdictions where reversals have been had on the ground of improper argument by a plaintiff's counsel in spite of the fact that defense counsel failed to object. (See *Minneapolis, St. Paul & Sault Ste. Marie Railway Co.* v. *Moquin,* 283 U.S. 520 [51 S.Ct. 501, 75 L.Ed. 1243] ; *Chicago & N.W. Ry. Co.* v. *Kelly, supra,* 84 F.2d

569.) But we are aware of no California case wherein a plaintiff's verdict was reversed for misconduct during his counsel's argument in the lack of timely objections and a request that the jury be admonished where such an admonishment could be effective. (See *Keena* v. *United Railroads,* 197 Cal. 148 [239 P. 1061]; *Love* v. *Wolf,* 226 Cal.App.2d —— [38 Cal. Rptr. 183]; *Deibler* v. *Wright, supra,* 119 Cal.App. 277; *Peacock* v. *Levy,* 114 Cal.App. 246 [299 P. 790]; *Jonte* v. *Key System, supra,* 89 Cal.App.2d 654.)

In the instant case we do not deem Mr. Boccardo's misconduct to be of such a character that it could not have been obviated by timely objections and instructions. Defense counsel, by his passive silence, undoubtedly encouraged the repetition of arguments which he now characterizes as so prejudicial that we should overlook his failure to object. He concedes that individual improprieties do not constitute grounds for reversal, but that the cumulative effect thereof requires this result. In such circumstances an attack on the instances of misconduct at the onset, together with proper instructions from the court to both the jury and counsel, would not only have removed the effect of the initial improprieties but would also have forestalled the commission of subsequent acts of misconduct. As this is the very reason for the rule requiring timely objections as a prerequisite to the assignment of misconduct on appeal, defendant cannot prevail in its assignment of the instant misconduct.

The judgment is affirmed.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., Peters, J., and Tobriner J., concurred.

Appellant's petition for a rehearing was denied September 10, 1964.