7 P.3d 459 (2000)
Kenneth DEJESUS, Appellant,
v.
Sherry FLICK, Respondent.
No. 30158.
Supreme Court of Nevada.
August 24, 2000.
*460 Beckley Singleton Jemison Cobeaga & List, Rex A. Jemison, Daniel F. Polsenberg, Las Vegas, for Appellant.
Mainor & Harris, W. Randall Mainor, Las Vegas, for Respondent.
BEFORE THE COURT EN BANC.

*461 OPINION

AGOSTI, J.:
This appeal is from a final judgment pursuant to a jury verdict and a subsequent order denying a new trial. The jury awarded respondent $1,470,000.00, substantially more than she requested, in a personal injury action arising out of an altercation on a Las Vegas freeway. The primary question presented on appeal is whether misconduct by the plaintiff's attorney so permeated the proceedings that it improperly influenced the jury, thereby warranting a new trial under NRCP 59(a). We conclude that it did; therefore, we reverse the district court's judgment and order and remand for a new trial on damages.

FACTS
In June 1992 respondent Sherry Flick was riding as a passenger in a vehicle driven by her sister, Julie Flick. As they proceeded southbound on Interstate 15 in Las Vegas, appellant Kenneth DeJesus tailgated the Flick vehicle, then moved into its lane and forced it off the roadway into a ravine in the freeway median. The off-road travel cracked the front axle of the Flick vehicle. DeJesus stopped, got out of his vehicle, pounded his fists on the windshield of the Flick vehicle and made threatening gestures. DeJesus was cited for misdemeanor assault, and later pleaded guilty to the offense.
Sherry Flick filed a personal injury action against DeJesus, claiming negligence.[1] DeJesus rejected an offer to settle for $100,000.00; however, he stipulated to liability, so the only issue for trial was Flick's damages. Consequently, most trial testimony related to the nature and extent of Flick's injuries.
Flick's medical experts, Dr. Edward N. Fishman and Dr. John Sterling Ford, testified that Flick sustained permanent brain and nerve damage when, during the accident, her head struck the vehicle and she jammed her hands against the dashboard. The brain damage caused Flick to suffer from headaches, dizzy episodes, blackouts, memory loss and neck pain, while the nerve damage caused numbness and tingling in Flick's hands, and curling of her outer fingers in a claw-like manner. Dr. Ford testified he was not able to locate the head injury precisely, but it appeared that the balance organ in the inner ear had been damaged. He also testified there was little hope that Flick's dizziness and blackout spells would cease, as they had persisted for four years, and that Flick's carpal tunnel syndrome was not likely to improve, as it was getting worse. Flick's sister, Julie, testified that these problems limited Flick's ability to drive and to work.
In contrast, DeJesus's medical experts, Dr. David Oliveri and Dr. Gerald Dunn, testified that the accident did not cause Flick's symptoms and that Flick's medical records did not indicate that she had a brain disorder until one year after the accident. Another physician, Dr. Robert Voy, testified that he treated Flick before the accident for kidney infections, which caused symptoms similar to those complained of after the accident: specifically, nausea, headaches, dizziness and blackout spells or momentary lapses of consciousness.
Flick's attorney, W. Randall Mainor, presented an emotional and provocative closing argument to the jury, and he injected his personal life and opinions into this argument. Among other things, Mainor personally vouched for the justness of his cause, talked about his grandchildren, his career with the FBI, his twenty years' experience as a trial lawyer, and even cried during his closing argument. Mainor expressed his disdain for DeJesus, said he was in a better position than the jury to know Flick's suffering and stated he would not trade the use of his own fingers for ten million dollars. In painting a negative image of DeJesus' medical experts, Mainor informed the jury that Drs. Dunn and Oliveri were motivated to testify for DeJesus solely by money and that, in his opinion, Dr. Oliveri lied and the jury could discard his testimony in a garbage can. Finally, Mainor invited the jury to punish defense *462 counsel and all civil defense attorneys with its verdict.
The jury returned a verdict of $1,470,000.00. The award included $100,000.00 for future medical expenses, far in excess of the $21,000.00[2] supported by the evidence and well in excess of counsel's request for $30,000.00 to $35,000.00, and $300,000.00 for future loss of income. The award also included $1,000,000.00 for future pain and suffering, approximately twice the amount counsel requested.
DeJesus moved for a new trial, claiming that Mainor's misconduct inflamed the jury's passions and prejudiced the jury's verdict. The district court denied the motion, concluding that substantial evidence supported the verdict. DeJesus appeals.[3]

DISCUSSION
Under NRCP 59(a)(2) and (6), a district court may grant a new trial based on "[m]isconduct of the jury or prevailing party" or when it appears that "[e]xcessive damages... have been given under the influence of passion or prejudice." On review, we will not disturb the district court's ruling on a motion for a new trial absent an abuse of discretion. Southern Pac. Transp. Co. v. Fitzgerald, 94 Nev. 241, 244, 577 P.2d 1234, 1236 (1978).
In Barrett v. Baird, 111 Nev. 1496, 1515, 908 P.2d 689, 702 (1995), we established the standard used to determine whether reversal is warranted by misconduct of the prevailing party's attorney:
"[t]o warrant reversal on grounds of attorney misconduct, the `flavor of misconduct must sufficiently permeate an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict.'" Kehr v. Smith Barney, Harris Upham & Co., Inc., 736 F.2d 1283, 1286 (9th Cir.1984) (quoting Standard Oil of California v. Perkins, 347 F.2d 379, 388 (9th Cir.1965)).
The district court may grant a new trial based upon such misconduct without proof that the misconduct changed the outcome of the first trial. Id. (citing Minneapolis, St. Paul & Sault Ste. Marie Ry. Co. v. Moquin, 283 U.S. 520, 521-22, 51 S.Ct. 501, 75 L.Ed. 1243 (1931)).
Initially, we note that DeJesus's attorney failed to object to most of Mainor's improper arguments. Generally, a failure to object to attorney misconduct precludes review. Southern Pac. Transp., 94 Nev. at 244, 577 P.2d at 1235 (noting that "[t]o preserve the contention for appellate review, specific objections must be made to allegedly improper closing argument"). Nevertheless, in light of the inflammatory quality and sheer quantity of misconduct in this case, review is warranted to prevent plain error. See Bradley v. Romeo, 102 Nev. 103, 104, 716 P.2d 227, 228 (1986) (recognizing that "[t]he ability of this court to consider relevant issues sua sponte in order to prevent plain error is well established"); see also Kaas v. Atlas Chem. Co., 623 So.2d 525, 526 (Fla.Dist.Ct.App.1993) (attorney's expression of his personal opinion that an expert witness is a liar is misconduct warranting a new trial, and no objection is required because such arguments fall squarely within that category of fundamental error in which the basic right to a fair trial has been fatally compromised); Sadler v. Arizona Flour Mills Co., 58 Ariz. 486, 121 P.2d 412, 413 (1942) (when prevailing party's attorney's misconduct during argument is a ground for vacating the verdict, trial court may grant a new trial despite the absence of any objection).
*463 Many of Mainor's arguments to the jury far exceeded the boundaries of acceptable professional conduct. The record is replete with examples; the following excerpts illustrate the level of impropriety that Mainor exhibited. To begin, Mainor inappropriately accused DeJesus's expert witness, Dr. Oliveri, of committing perjury and personally attacked his credibility:
I guarantee you if I'd have hired Oliveri, you'd have heard that [Flick] had all these problems. I guarantee you that. If I'd have given him fifteen hundred bucks ($1500.00), he'd have come in and he would have been able to concur with Ford [Flick's expert]. That's the way it works. That's the real world. See, you folks don't know that. But I've been doing this for twenty years and that's the way it's done. Andand what they try to do is influence jurors by this nonsense, these IMEs. They're not independent of anything. They are biased and prejudiced against people who are hurt.
....
[T]he reason why I put [Flick's] dad on for the one question, it was to merely show you folks that Oliveri does notdid not tell the truth. I knew I could ... present evidence that he wasn't qualified in what he was saying and I knew his opinions wouldn't hold any water, but I wanted you toI wanted you to look at him and question his truthfulness.
I was going to have [Flick's dad] tell more about what he observed there, but all that would have done, I think, is make Oliveri look a little more stupid than I'd already done, and I didn't think that was necessary.... [T]he issue is was [Oliveri] telling the truth and the answer is, no, he wasn't.
You're at liberty, if you want, to take Oliveri's testimony and tear it up and throw it in the garbage can because I think he lied on the stand, didn't necessarily lie but didn't totally tell the truth.... He violated his oath because he told the truth but he didn't tell the whole truth, and he told a few things other than the truth. His testimony isis not credible in my estimation.
Mainor improperly interjected his personal opinions about the defendant. He told the jury how much he personally disliked DeJesus because DeJesus nearly killed two people and because he had acquired some sense of Flick's suffering during preparation for trial:
I have a hard time liking this man. He nearly killed a couple of people. And, you know, I'm not sure that I accept his repentance. I have a forgiving heart. I think I can do that. But I can tell you, I don't like him. And the reason why I don't is because you guys have only seen [Flick] for four days. I've seen her for nearly two years. I've seen her a lot. And you got a little bit of a sense of what she's been going through. I have a much greater sense of what she's gone through `cause I've been with her and been with her family.
Mainor improperly gave his personal opinion as to the justness of Flick's cause, and that of other plaintiffs claiming injuries. Although he stated to the jury that the case was not a crusade for him, he explained that it was close to a crusade because defense counsel was trying to get the jury to shortchange Flick's damage claim. Thus, Mainor asked the jury to send a "message" to defense firms in town:
What I'd like the message to be to this law firm and to other law firms is, dang it, when someone is hurt, pay them, pay them what's reasonable and let's go on with life. But if you let them get away with this, if you let them get away with bringing some clown like Oliveri in here to try to convince the jury thatthat she's not hurt, they'll keep doing that .... that's the way the game is played, ... that's what happens, that's what the power brokers of this world do to people like you.
Mainor also impermissibly asked the jurors to place themselves in Flick's position:
I want you men to listen to these women because ... there's things that a woman experiences that you don't.... [Y]ou're going to be able to tap in a little bit to their feelings, I think, as to fear.... [Flick's] afraid to be alone. She's afraid to take a bath because if she gets in the bathtub and she's sitting there enjoying a bath and has *464 one of these things, she'd go in the water and she's dead. There's just hundreds of things like that. She's afraid ... that if she gets married ... to have a baby. I mean, think of ... the human suffering that would occur if she gets pregnant and falls down and loses her baby or, worse yet, drops her baby and hurts her baby.
After summarizing the evidence regarding medical expenses and lost income, Mainor told the jury the hard part would be calculating fair and reasonable compensation for Flick's pain and suffering, and lost job opportunities. Mainor indicated he would not trade places with Flick for ten million dollars and asked the jury:
How do you compensatewell, how do you put a value on not using your fingers? I don't know. I mean, I don't know how you do that.... I wouldn't take ten million dollars if I had to do this. I like to play golf once in awhile. And if I couldn't play golf, I mean, I wouldn't die but II just would not do that.
All of these arguments, and others not included here, were improper and inflammatory, and constituted egregious misconduct. Mainor's attack on Dr. Oliveri, as well as DeJesus, and his commentary on the virtues of Flick's cause, blatantly violated SCR 173, which provides that "[a] lawyer shall not ... state a personal opinion as to the justness of a cause, the credibility of a witness, [or] the culpability of a civil litigant." See Yates v. State, 103 Nev. 200, 204, 734 P.2d 1252, 1255 (1987) (improper to characterize a doctor's testimony as "melarky," "outright fraud" or to accuse the doctor of "crawl[ing] up on the witness stand"); Sipsas v. State, 102 Nev. 119, 125, 716 P.2d 231, 234 (1986) (improper to call a medical expert a "hired gun from Hot Tub Country" and "a living example of Lincoln's law [who] can fool all of the people enough of the time"); Owens v. State, 96 Nev. 880, 886, 620 P.2d 1236, 1239 (1980) (improper to argue that "I was brought up to believe that there is some good in all of us. For the life of me, on the evidence presented to me, I can't see the good in [this defendant]").
Further, Mainor impermissibly asked the jurors to place themselves in Flick's position when he asked them to "tap into feelings" about Flick's fears, in light of her physical condition, and to "send a message" to law firms that try to prevent injured persons from recovering ("that's what the power brokers of this world do to people like you"). We have previously held that such "golden rule" arguments are forbidden because they interfere with the jury's objectivity. See Boyd v. Pernicano, 79 Nev. 356, 358, 385 P.2d 342, 343 (1963) (improper to ask the jurors to place themselves in the shoes of the victim because such argument interferes with the objectivity of the jury); see also DuBois v. Grant, 108 Nev. 478, 481, 835 P.2d 14, 16 (1992) (golden rule argument is the impermissible suggestion that the jurors trade places with the victim); McGuire v. State, 100 Nev. 153, 158, 677 P.2d 1060, 1064 (1984).
With respect to his "power broker" message, the fact that Mainor did not expressly remind the jury that Flick is "people like you" does not save him from a violation of the golden rule. He clearly asked the jurors to "allow such recovery as they would wish if in the same position." Moreover, Mainor's "testimony" during his argument, that he personally would not want to trade ten million dollars for the use of his fingers, violated the golden rule. While making this argument, he asked the jurors, "How do you put a value on not using your fingers?" He thus invited the jury to agree that neither would they make such a trade.
Individually, Mainor's inappropriate remarks violated well-established standards of professional conduct. Taken cumulatively, Mainor's improper arguments so thoroughly permeated the proceeding that we are convinced they tainted the entire trial and resulted in a jury verdict that was the product of passion and prejudice. The $1,470,000.00 verdict plainly reflects the influence of counsel's improper arguments. There is simply no other explanation for it, particularly in light of the conflicting expert testimony regarding Flick's injuries.[4] The award far exceeds *465 what counsel requested, and there is no objective basis in the record to support it.[5] It is apparent that the jury accepted Mainor's improper invitation to punish the "power brokers" and send a message to all the defense attorneys who try to shortchange people like Flick and themselves. Given Mainor's impropriety, DeJesus was deprived of a fair trial.[6]
We therefore conclude that the district court abused its discretion in denying a new trial under NRCP 59(a)(2), misconduct by the prevailing party, and NRCP 59(a)(6), excessive damages awarded "under the influence of passion or prejudice." Accordingly, we reverse the district court's judgment and remand for a new trial on damages.[7]
YOUNG and BECKER, JJ., concur.
PAPEZ, D.J., concurring.
The record in this case is replete with instances of serious misconduct by plaintiff's counsel during summation. Rather than "isolated instances" of misconduct as the dissent suggests, it appears to me that plaintiff's counsel, an accomplished trial attorney with over twenty years of experience, strayed across the permissible boundaries of argument with calculation and purpose. That purpose was realized in a verdict returned by the jury far in excess of what plaintiff requested. I believe the verdict was the product of counsel's calculated, repeated and seriously improper argument to the jury.
Without question, the facts of this case are upsetting, and naturally evoke sympathy for plaintiff and anger toward defendant. A young woman's health and life have been drastically altered because of the acts of the defendant. Plaintiff deserves to be and should be compensated for these damages. Counsel's zeal for his client's cause does not, however, allow for departure from the ethical and procedural rules of fair play. Because the amount of compensation owed to plaintiff is in dispute, a jury in a neutral and impartial forum, free from passion or prejudice, must decide the damage claim.
As stated in the Hamline Law Review, in an article entitled "Summation At The Border: Serious Misconduct In Final Argument In Civil Trials":
One speculates that litigators evaluate their own final argument misconduct, at least implicitly, by subjective standards such as motive and intent. In moral evaluations, if the ends are good, one tends to be more lenient when criticizing the means by which the ends were achieved. One may think, "A mistake was made, but he or she was trying to do the right thing."
Acts grounded in good motives tend to be treated more leniently than are acts grounded in bad motiveshe or she was a good person, even if he or she did a bad thing. One would expect that litigators' evaluations of their own final argument misconduct to be consciously or subconsciously colored by the overall "goodness" of their client or their claim, and the "justness" of the outcome sought. The litigator's platform is one of feeling that his or her motives are good, his or her client's motives are good, his or her claim is good, and the outcome he or she seeks is good. *466 Conversely, a litigator may feel that opposing counsel is bad, the opposing party is bad, or the claims or the underlying conduct, or both, are bad. One cannot fail to see how annoying and aggravating it is to be faced with these factors, particularly in the focused, emotional atmosphere of a trial. Serious misconduct in final argument in civil trials may be the result of excesses on the part of well-intentioned counsel.
Nonetheless, the objective approach to serious misconduct in final argument is the correct approach. Parties, whether popular or unpopular, must be permitted to make claims and defenses in a neutral and impartial system. Serious misconduct in final argument can never be justified, not even with reference to motive or intent. What matters the most is the type of conduct and its impact.
19 Hamline Law Review 179, 192-193 (1995).
Because of the serious nature of the misconduct and the obvious impact on the verdict, this matter should be retried.
Another troubling aspect of this case is what the dissent calls "a freewheeling atmosphere" in which the case was tried. Certainly it is the responsibility of counsel to make objections and seek rulings from the trial court to prevent "a freewheeling atmosphere" from developing. In my opinion, when serious misconduct occurs and is not met by an objection, a trial judge has an obligation to intervene sua sponte to protect the litigant's right to a fair trial. See Sipsas v. State, 102 Nev. 119, 125, 716 P.2d 231, 235 (1986). See also Casey v. Musgrave, 72 Nev. 31, 292 P.2d 1066 (1956) (a trial judge is charged with a superintending duty to regulate and control the course of proceedings in a trial); Schreier v. Parker, 415 So.2d 794 (Fla.Dist.Ct.App.1982) (arguments in derogation of professional conduct rules should not be condoned by a trial court, even absentobjection); Wanner v. Keenan, 22 Ill.App.3d 930, 317 N.E.2d 114 (1974) (the trial judge is responsible for the justice of his judgments and has a duty to control the trial in order to ensure a just result); Paulsen v. Gateway Transportation Co., 114 Ill.App.2d 241, 252 N.E.2d 406 (1969) (if the argument of counsel is seriously prejudicial, the trial court sua sponte should stop the argument and direct the jury not to consider it); N.Y. Central R.R. Co. v. Johnson, 279 U.S. 310, 49 S.Ct. 300, 73 L.Ed. 706 (1929) (every litigation should be conducted fairly and impartially and the public interest requires that a trial court sua sponte exercise its power and duty to protect litigants in their right to a verdict, uninfluenced by the appeals of counsel to passion or prejudice).
If the trial judges of Nevada would aggressively intervene in instances of serious misconduct by counsel where no objection is tendered, it would seem to me that appellate litigation in this area would be greatly reduced.
ROSE, C.J., with whom SHEARING and LEAVITT, JJ., agree, dissenting.
This is a case about the road rage conduct of Kenneth DeJesus that caused a substantial permanent brain injury to Sherry Flick. The majority concludes that the jury's award be reversed because Sherry's attorney made improper statements, despite the fact these statements were not objected to. I disagree. I believe that some of the statements that were not objected to were not improper. I further believe that those statements that were improper did not so pervade the trial with prejudice as to require the reversal of this case. I would therefore affirm the judgment entered below, except for the award for future medical expenses, which I would reduce to an amount supported by the evidence.
Sherry sustained serious injuries while riding as a passenger in a vehicle driven by her sister on the freeway. Because DeJesus believed that Sherry's sister had cut him off in traffic, DeJesus began tailgating the Flick vehicle. DeJesus then pulled ahead and cut the Flick vehicle off, forcing it into the dirt and bushes in the median. The force of the impact with the median broke the axle of the Flick vehicle, disabling the car. Upon leaving his vehicle, DeJesus leaned over the front hood of the Flick car, pounded his fists on the front windshield, and demanded that Sherry and her sister exit their car. Sherry and her sister were paralyzed with fear, and *467 Sherry testified that DeJesus made a throatslashing gesture signaling "that he was going to cut my throat or kill me or Julie or the people who were there."
DeJesus then left the scene of the accident, but later returned. Upon his return to the scene, DeJesus was cited for misdemeanor assault for cutting off the Flick vehicle, and pleaded guilty to this charge. Thereafter, Flick filed a negligence action against DeJesus.
Prior to trial, DeJesus's attorneys admitted liability, and then attempted to suppress the inflammatory facts concerning DeJesus's conduct. The District Court denied this attempt to conceal DeJesus's inflammatory acts, and even the majority agrees that these facts were admissible and relevant to Sherry's physical and emotional injuries caused by DeJesus.
Because of the inflammatory nature of DeJesus's conduct, I believe that it is more likely that the jury was inflamed by his road rage, rather than Sherry's attorney's statements. Indeed, DeJesus's conduct was so egregious that going into this trial, anyone could have predicted that the jury would give top dollar for any injuries it believed Sherry sustained.
We will affirm a jury verdict that is alleged to be excessive provided it is supported by substantial evidence. See Yamaha Motor Co. v. Arnoult, 114 Nev. 233, 955 P.2d 661 (1998). There was substantial, although contradicting, evidence presented to support the jury's award of damages. Although DeJesus's experts opined that Sherry did not have any serious injuries, Sherry's neurologist and medical expert testified that she had sustained a moderate brain injury from the accident and would have periodic spells of dizziness and blackouts for the rest of her life. Sherry's neurologist further testified that Sherry had permanently damaged the nerves in her hands, resulting in numbness and the clawing of her fingers.
Shortly after the accident, Sherry testified that she would fall when she blacked out, resulting one time in black eyes and another time in burns from hot asphalt on her hands, knees, and legs. Sherry further testified that she was afraid to become a mother because she might black out and injure her baby, and that she was afraid she would lose her driver's license and eventually be unable to drive because of her blackouts. While damages were high in this matter, they nonetheless are supported by substantial evidence provided the jury believed the physicians who testified in Sherry's favor. Again, when considering that Sherry's injuries were essentially the product of road rage, a recent phenomenon that has many drivers fearing for their safety on the streets, the high verdict in this case should have surprised no one.[1]
In reviewing whether an attorney's improper statements affect the verdict, this court considers whether Sherry's attorney's statements were so prejudicial and egregious that they infected the entire trial so that the judgment could only be the result of that misconduct. See Barrett v. Baird, 111 Nev. 1496, 908 P.2d 689 (1995). I conclude that the proceeding below was not so prejudicial and egregious as to warrant reversal, and the high verdict was in all probability the result of DeJesus's road rage conduct.
Preliminarily I note that several statements made in closing argument and characterized as improper do not seem improper to me. Sherry's attorney argued that in considering future damages, the men on the jury should consider the problems and emotional trauma Sherry would experience if she became pregnant. While perhaps inartfully phrased, any concern that Sherry's attorney *468 was asking the male jurors to put themselves in Sherry's place could have been cured by an objection that would have simply resulted in Sherry's attorney rephrasing his argument. Further, Sherry's attorney's statement that the jury should tap into Sherry's feelings of fear likewise is not improper because it was a mere reference to the evidence presented, namely Sherry's testimony concerning her fear, and not a request for the jurors to place themselves in Sherry's place.
At another point in closing argument, Sherry's attorney commented that the jury had the right to reject Oliveri's medical testimony because his testimony was bought and paid for. I believe that this was a permissible argument in light of both Oliveri's large fee and the starkly contradicting medical testimony presented by the parties. First, during cross-examination of Dr. Oliveri, Sherry's attorney elicited the fact that he was charging a total of $5000.00 for his testimony. Second, Dr. Oliveri's statement that Sherry was able to stand with her eyes closed without losing her balance was directly contradicted by Sherry's father, who testified that Sherry fell backwards when performing this test in Dr. Oliveri's presence. Third, Dr. Oliveri testified that Sherry's symptoms were inconsistent with a brain injury, while Sherry's doctors testified to the contrary. It can be inferred from the aforementioned evidence in the record that Dr. Oliveri's testimony was misleading and paid for by excessive fees. I see nothing wrong with a part arguing that the medical testimony produced by the opposing party was the result of something other than objective assessment where that party has produced contradicting evidence.
I do agree with the majority, however, that the continuing argument by Sherry's attorney that this is how the system works, how civil defense attorneys secure the desired testimony, and that the verdict should punish all civil defense attorneys was improper in a negligence action where punitive damages are disallowed. However, Sherry's attorney did not object to these arguments. Moreover, the record reveals that both plaintiff's and defendant's attorneys permitted a lot of testimony and argument into evidence without objection, creating a freewheeling atmosphere that the district court permitted.
In civil cases, we place great reliance on the advocacy system and require the attorneys for the parties to present their case competently and to timely state all objections. If evidence or argument is not objected to, it cannot be later claimed as grounds for reversal unless it can be determined that plain error occurred that prejudiced and inflamed the jury.
Other courts have faced factual situations very similar to the one presented here, and these courts have developed a rule that would better compliment our holding in Barrett v. Baird, 111 Nev. 1496, 908 P.2d 689 (1995). See Horn v. Atchison, Topeka and Santa Fe Ry. Co., 61 Cal.2d 602, 39 Cal.Rptr. 721, 394 P.2d 561, 565 (1964); Neumann v. Bishop, 59 Cal.App.3d 451, 130 Cal.Rptr. 786, 811-12 (1976); Budget Rent A Car Sys., Inc. v. Jana, 600 So.2d 466, 467-68 (Fla.Dist.Ct.App.1992).
In Horn, the California Supreme Court concluded that the remarks of plaintiff's counsel had created an atmosphere of bias and prejudice that was manifestly calculated to deprive the defendant of a new trial. 39 Cal.Rptr. 721, 394 P.2d at 565. Despite this conclusion, the court affirmed the jury's verdict for plaintiff and held that the defendant had waived his right to complain by failing to object:
Generally, a claim of misconduct is entitled to no consideration on appeal unless the record shows a timely and proper objection and a request that the jury be admonished. The purpose of the rule requiring the making of timely objections is remedial in nature, and seeks to give the court the opportunity to admonish the jury, instruct counsel and forestall the accumulation of prejudice by repeated improprieties, thus avoiding the necessity of a retrial. "It is only in extreme cases that the court, when acting promptly and speaking clearly and directly on the subject, cannot, by instructing the jury to disregard such matters, correct the impropriety of the act of counsel and remove any effect his conduct or remarks would otherwise have." In the absence of a timely *469 objection the offended party is deemed to have waived the claim of error through his participation in the atmosphere which produced the claim of prejudice.
Horn, 39 Cal.Rptr. 721, 394 P.2d at 565-66 (emphasis added) (citations omitted) (quoting Tingley v. Times-Mirror Co., 151 Cal. 1, 89 P. 1097, 1106 (1907)).
Numerous other California courts have followed the holding in Horn and affirmed verdicts where there was improper trial conduct to which the opposing attorney failed to object. For example, in Sabella v. Southern Pacific Co., 70 Cal.2d 311, 74 Cal.Rptr. 534, 449 P.2d 750, 754 (Cal.1969), the court affirmed a verdict for plaintiff despite the fact that plaintiff's counsel had accused the defense witnesses of committing perjury, appealed to the jurors' sympathies through repeated references to both the defendant's wealth and plaintiff's lack of resources, and made an improper golden rule argument.
Similarly, in Neumann, 130 Cal.Rptr. at 811-12, the court concluded that plaintiff's counsel had made numerous improper arguments, including several improper golden rule arguments, an argument that pain and suffering should be four times the special damages, and an erroneous argument that the defendant had a right to indemnity. Despite this impropriety, the court affirmed the jury verdict and held that the defense counsel had waived its claim of error by failing to object or by making an inadequate objection. See Neumann, 130 Cal.Rptr. at 812. The court further concluded that the jury's award was not so "grossly excessive as to shock the moral sense so that the trial court as well as the jury can be deemed to have succumbed to passion or prejudice." Id. at 814.
The Florida courts, like California, have also recognized that the failure to object to an attorney's improper argument in a civil case generally constitutes a waiver of the right to appeal this issue. In Budget Rent A Car Systems, Inc. v. Jana, 600 So.2d 466, 467-68 (Fla.Dist.Ct.App.1992), the court held that although the plaintiff's attorney clearly made arguments "in violation of the well known golden rule," review of this issue was precluded, as the defense counsel did not object and the arguments made were not "sinister":
This court has held that, absent contemporaneous objection, an improper comment made during closing remarks will not support reversal. In [one Florida appellate case] this court held that failure to object below to improper comments made in closing remarks constitutes a waiver of any right to complain on appeal. It is only in those rare circumstances where the comments are "of such sinister influence as to constitute irreparable and fundamental error" that the absence of objection will be overlooked.

Id. at 467-68 (emphasis added) (citations omitted) (quoting LeRetilley v. Harris, 354 So.2d 1213 (Fla.Dist.Ct.App.1978)).
As in California and Florida, our review should narrow where there is no objection in order to discourage the needless waste of judicial resources required for a new trial. See generally McGuire v. State, 100 Nev. 153, 158-59, 677 P.2d 1060, 1065 (1984) (discussing the costs associated with attorney misconduct). Indeed, the failure to object frustrates the district court's ability to admonish the jury and instruct counsel so that it may forestall the accumulation of prejudice, thereby avoiding the necessity of a new trial. See Horn, 39 Cal.Rptr. 721, 394 P.2d at 565.
I am concerned that this case will increase appellate litigation. In the future, this court will be required to review many more civil cases where improper argument is claimed but no objection was made at trial. Adopting the rule espoused in Horn, Neumann, and Budget Rent A Car would prevent this situation from occurring.
Sherry sustained permanent brain damage from the road rage conduct of DeJesus. Substantial evidence supported the admittedly high jury award. I am convinced, however, that if the jury was in any way inflamed, such passion was caused by the conduct of DeJesus and not by a few improper statements made by Sherry's attorney. I would affirm the verdict with the exception that I would reduce future medical expenses to the *470 evidence presented. Accordingly, I dissent to the majority opinion.
SHEARING and LEAVITT, JJ., concur.
NOTES
[1] Flick also named her sister Julie as a defendant, but settled with her before trial for $10,000.00.
[2] Letters by Flick's experts, Dr. Fishman and Dr. Ford, indicated that Flick's future medical expenses could reach $21,000.00.
[3] DeJesus also contends that a new trial is warranted because the district court abused its discretion by admitting evidence of DeJesus's intentional conduct during the freeway altercation, as it was irrelevant and prejudicial. We disagree. We conclude that the district court did not abuse its discretion in admitting this evidence as relevant to Flick's claim for mental pain and suffering. See Southern Pac. Transp. Co. v. Fitzgerald, 94 Nev. 241, 243, 577 P.2d 1234, 1235 (1978) (noting that a district court has broad discretion in deciding whether evidence is admissible); NRS 48.015 (defining relevant evidence); NRS 48.035 (providing that relevant evidence is admissible "if its probative value is [not] substantially outweighed by the danger of unfair prejudice").
[4] See Boyd, 79 Nev. at 359, 385 P.2d at 343 (concluding that counsel's inappropriate statements are given more weight when a notable conflict in the evidence exists).
[5] Counsel argued that Flick's future medical expenses would range between $30,000.00 and $35,000.00, but he miscalculated the total sum supported by the medical evidence; as previously noted, the evidence submitted to the jury supports an award of $21,000.00, at most. The jury disregarded the evidence and awarded Flick $100,000.00 for future medical expenses. Similarly, depending on the method of calculation used, counsel asked for $400,000.00 to $630,000.00 for Flick's future pain and suffering. The jury awarded $1,000,000.00.
[6] The dissent offers as a possible alternative explanation for the unreliable verdict, that it was solely the result of the jurors' negative reaction to DeJesus's road rage conduct. After reading what is characterized in the concurring opinion as a record "replete with instances of serious misconduct by [Mainor] during the summation," one cannot accept the dissent's theory. Of course, DeJesus's conduct was deplorable. And Mainor impermissibly capitalized on those facts to inflame the jury and to incite the jury to decide this case out of moral indignation against DeJesus and a desire to punish him. The verdict was in no way reliable as a reflection of the value of Sherry Flick's case.
[7] The Honorable Dan L. Papez, Judge of the Seventh Judicial District Court, was designated by the Governor to sit in place of the Honorable A. William Maupin, Justice. Nev. Const. art. 6, § 4.
[1] DeJesus cites an offer of judgment made by Sherry to settle for $100,000.00. Offers of judgment are made for several reasons and often have no relation to the value of the offering party's case. Specifically, offers are often made for a defendant's insurance policy limits, but the insurance company is unwilling to pay the policy limits to an injured plaintiff. By refusing to pay the policy limits, the risk of an excess verdict is transferred to the insurance company. See, Green v. J.C. Penney Auto Ins. Co., 806 F.2d 759, 763-64 (7th Cir.1986); 46A C.J.S.Insurance § 1584 (1993). While settlement negotiations are usually not part of the record on appeal, I would suspect that Sherry's offer to settle for $100,000.00 was a demand for the policy limits and made to obtain a strategical advantage once the insurance company refused to pay, and not made because Sherry thought $100,000.00 was the value of her case.