Filed 10/1/13  Moelleken v. Jones CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| ALAN MOELLEKEN, M.D., et al., | 2d Civil No. B242545 |
| Plaintiffs and Appellants, | (Super. Ct. No. 1339785) |
|  | (Santa Barbara County) |
| v. |  |
| THOMAS JONES, M.D., et al., |  |
| Defendant and Respondent. |  |

Andrew Moelleken, M.D., OSF Medical Group of California, Inc., and Carrillo Surgery Center, Inc., appeal from the judgment entered following a jury verdict in favor of respondents Santa Barbara Cottage Hospital, Cottage Health System, Thomas H. Jones, M.D., E. Scott Conner, M.D., Richard Chung M.D., and Alois Zauner, M.D. (respondents).  Appellants brought an antitrust action against respondents.  Appellants claimed that respondents had unlawfully agreed to restrain competition by excluding orthopedic spine surgeons, including Dr. Moelleken, from performing spinal surgery on emergency and trauma patients at Santa Barbara Cottage Hospital (the hospital).

Appellants contend that the trial court erred in instructing the jury and denying their motion for a new trial.  The motion was based on the following grounds: (1) the trial court had erroneously refused to permit appellants to call rebuttal witnesses, (2) two jurors had committed prejudicial misconduct during deliberations, and (3) respondents' counsel had committed prejudicial misconduct during opening statement.  We affirm.

*Factual and Procedural Background*

Trauma centers are rated at levels I through IV. Level I is the highest rating. The hospital is a level II trauma center. Its emergency room is used by both the trauma service and the emergency department. The emergency department treats minor injuries, while the trauma service treats serious injuries.

As a level II trauma center, the hospital is required to have neurosurgeons and orthopedic surgeons on call at all times. Neurosurgeons specialize in surgical treatment of the brain and spine. Some specially trained orthopedic surgeons perform spinal surgery. Dr. Moelleken is an orthopedic surgeon who specializes in spinal surgery.

The hospital established call panels, which are "list[s] of physicians . . . [who] are going to be backup to the emergency room for unassigned patients," i.e., patients who do not have their own doctor. Steven Fellows, the hospital's Executive Vice President and Chief Operating Officer, explained: "[W]hen you are on trauma call, you are also on emergency department call. There's an obligation to do both. [¶] When you are on emergency department call, you make yourself available for trauma consultations . . . ." Physicians on the same call panel work together as a team.

Neurosurgeons on the neurosurgery call panel treated emergency and trauma patients with spinal problems. Orthopedic spine surgeons, such as Dr. Moelleken, were not on call for these patients and therefore did not treat them. Dr. Moelleken and Dr. Kahmann, another orthopedic surgeon who specializes in spinal surgery, asked the hospital to establish a separate spine call panel that would include both orthopedic spine surgeons and neurosurgeons. The spine call panel would treat emergency and trauma patients with spinal problems. Dr. Moelleken testified: "All I wanted was access to the ER [emergency room] and trauma patients."

Respondents Drs. Jones, Conner, Chung, and Zauner were neurosurgeons on the neurosurgery call panel. Drs. Jones, Conner, and Chung formed a partnership: Neurosurgical Associates of Santa Barbara. In March 2004 Dr. Jones wrote a letter to the hospital opposing the establishment of a spine call panel. Dr. Jones wrote, "We [i.e., Drs. Jones, Conner and Chung] as a group strongly encourage the hospital to continue the

2.

present system. If a spine call concept is instituted without our agreement, we feel this will make our present trauma call contract null and void, and we would then choose to renegotiate with the hospital about the coverage we provide." By the term "contract," Dr. Jones was referring to a "Physicians Services Agreement . . . that includes both trauma care and emergency room care."

In December 2007 Dr. Kahmann wrote to the hospital's Medical Executive Committee: "The Orthopedic department [of the hospital] voted unanimously to allow the appropriately qualified and credentialed orthopedic spine surgeons to be able to participate in the call panel of the ER [emergency room] and the Trauma Service in the care of spine patients. . . . Today, the orthopedic spine surgeons are denied access to care for these patients; all spine patients . . . are referred to the neurosurgeon on call even though orthopedic spine surgeons are equally trained and qualified to care for these problems. This is not right. I strongly believe that all appropriately qualified and credentialed spinal surgeons, whether in the Neurosurgery or Orthopedics department, should have the ability to participate in a call panel to care for these patients."

The hospital formed a Spine Call Panel Task Force to study the issue. The voting members of the task force were neither neurosurgeons nor orthopedic spine surgeons. Dr. Jones wrote an email to the chairman of the task force, Dr. Gayou. Dr. Jones stated: "We [i.e., Drs. Jones, Conner, and Chung], at this time, will continue to take Neurosurgery call. We have no interest in a separate 'Spine Call.' The Medical Staff and Hospital can obviously make any concession that they want to but if it affects our neurosurgical call obligations and responsibilities we will, of course, reassess continuing the same call relationships going forward." Dr. Gayou told the other members of the task force that they should not consider Dr. Jones's email in determining whether to recommend the establishment of a spine call panel.

In November 2008 the seven voting members of the task force unanimously recommended that a spine call panel not be established. The hospital implemented the recommendation.

3.

In September 2009 appellants filed a complaint against respondents. The operative complaint is the first amended complaint (the complaint) filed in August 2011. The complaint consisted of five causes of action, two of which were dismissed. The surviving causes of action were the first, second, and fourth. The first cause of action alleged that, in violation of California's antitrust law (the Cartwright Act, Bus. & Prof. Code, § 16700 et seq.), the neurosurgeon respondents (Drs. Jones, Conner, Chung, and Zauner) had conspired to restrain competition by excluding Moelleken and other orthopedic spine surgeons from performing "emergency spine trauma surgery" at the hospital. The second cause of action alleged that all of the respondents, including the hospital, had participated in an identical conspiracy. The fourth cause of action alleged that respondents had committed unfair business practices in violation of California's unfair competition law. (Bus. & Prof. Code, § 17200 et seq.).

On the first and second causes of action for violation of the antitrust law, the jury rendered a special verdict in favor of respondents. The trial court noted that the jury had heard "almost 7 weeks of practically uninterrupted testimony." The trial court, sitting in equity, found that respondents had not engaged in unfair business practices as alleged in the fourth cause of action.[1]

*Jury Instructions*

On the antitrust causes of action, before trial appellants submitted a jury instruction requiring them to prove that respondents had "entered into an agreement to

---

[1] In a footnote, appellants claim that this finding was erroneous. We reject the claim because "it is asserted perfunctorily on appeal in a footnote" without meaningful legal analysis or a separate heading. (*Bollay v. California Office of Administrative Law* (2011) 193 Cal.App.4th 103, 111; see also *In re S.C.* (2006) 138 Cal.App.4th 396, 408 ["To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error"]; *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830, fn. 4 ["The failure to head an argument as required by California Rules of Court, rule [8.204(a)(1)(B)] constitutes a waiver"]; *People v. McElroy* (2005) 126 Cal.App.4th 874, 884, Fn. 3 ["To the extent defendant complains the jury was not instructed on the meaning of 'unlawfully' without a separate heading, defendant has waived any claim of error"].)

interfere with the competitive opportunity of the orthopedic surgeons, including Dr. Moelleken, to perform spine surgeries on trauma *or* emergency patients." (Italics added.) The trial court substituted "and" for "or." Appellants contend that this modification was prejudicial error because it precluded them from arguing that the jury "could . . . find the existence of an agreement that covered the emergency department only."

" ' "The propriety of jury instructions is a question of law that we review de novo. [Citation.]" [Citation.]' [Citation.] Where it is contended that the trial judge gave an erroneous instruction, we view the evidence in the light most favorable to the claim of instructional error. [Citations.]" (*Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 845-846.)

"A party is entitled upon request to . . . instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.) Appellants' wrongly assume that substantial evidence supports the existence of an agreement to exclude orthopedic spine surgeons from performing surgeries on emergency patients but not on trauma patients. The evidence supports only an agreement to exclude orthopedic spine surgeons from performing surgeries on both emergency *and* trauma patients. This exclusion would be achieved by refusing to establish a spine call panel consisting of neurosurgeons and orthopedic spine surgeons who would treat emergency *and* trauma spine patients. Without a spine call panel, orthopedic spine surgeons would not be called to perform surgery on these patients. Dr. Moelleken testified that the refusal to establish a spine call panel had financially damaged him because it had "denied [him] access to patients in the emergency room and the trauma service." Dr. Moelleken further testified that his "claim" was that he was "being denied [access to the] emergency room and trauma." Dr. Moelleken was then asked: "Now, Doctor, was this call schedule for the emergency room or for trauma service or for both?" Dr. Moelleken replied, "Well, they were one in the same."

Appellants did not advance a trial theory of an agreement to exclude Dr. Moelleken from performing emergency but not trauma spinal surgeries. In opening statement, appellants counsel stated: "The plaintiffs here must prove only that there was

5.

an agreement between the neurosurgeons, on the one hand, and the hospital on the other to exclude Dr. Moelleken and other orthopedic spine surgeons from performing spine surgeries on trauma *and* emergency patients at Santa Barbara Cottage Hospital." (Italics added.)

The trial court, therefore, did not err when it modified the instruction that appellants had submitted before trial. Even if it had erred, the error would not compel a reversal. "A judgment may not be reversed on the basis of instructional error . . . unless there is a reasonable probability that, in the absence of the error, a result more favorable to the appealing party would have been reached. [Citation.]" (*Scott v. Rayhrer* (2010) 185 Cal.App.4th 1535, 1540.) If the unmodified instruction had been given, it is not reasonably probable that the jury would have found an agreement to exclude Dr. Moelleken from performing emergency but not trauma spinal surgery or vice versa.

*Rebuttal Witnesses*

Appellants argue that the trial court erroneously denied their motion for a new trial on the ground of the court's refusal to permit them to call two rebuttal witnesses: Drs. Amy Wickman and Richard Delamarter. Appellants allege: "The trial court's refusal . . . constitutes an irregularity and error in the proceedings" within the meaning of Code of Civil Procedure section 657, subdivision 1.[2]

"We will not disturb the trial court's determination of a motion for a new trial unless the court has abused its discretion. [Citation.] When the court has denied a motion for a new trial, however, we must determine whether the court abused its discretion by examining the entire record and making an independent assessment of whether there were grounds for granting the motion. [Citation.]" (*ABF Capital Corp. v. Berglass* (2005) 130 Cal.App.4th 825, 832; accord, *Santillan v. Roman Catholic Bishop of Fresno* (2012) 202 Cal.App.4th 708, 733.)

---

[2] Section 657, subdivision 1 provides that a new trial may be granted for "[i]rregularity in the proceedings of the court, jury, or adverse party, or any order of the court or abuse of discretion by which either party was prevented from having a fair trial."

## Dr. Wickman

Appellants' counsel told the court that Dr. Wickham is a local orthopedic spine surgeon who would testify "[t]hat she wants to do spine work, and that they [the hospital] told her there was no spine panel." Dr. Wickham would also testify that she was on a general orthopedic call panel for approximately five months and had only one emergency spine patient. Respondents objected that Dr. Wickham was not on the witness list and that her testimony "should have been given in the case-in-chief." The trial court sustained the objection.

"Rebuttal evidence is generally defined as evidence addressed to the evidence produced by the opposite party and does not include mere cumulative evidence of the plaintiff's case in chief. [Citation.]" (*Edgar v. Workmen's Compensation Appeals Bd.* (1966) 246 Cal.App.2d 660, 665.) "The law is established that one who has the affirmative of an issue may not reserve a portion of his evidence until an opposite party has exhausted his evidence . . . . If he does so the court may refuse to allow him to introduce additional evidence on the subject after defendant rests. [Citation.]" (*Bates v. Newman* (1953) 121 Cal.App.2d 800, 806.) "The trial court is vested with discretion over the scope of rebuttal, and its ruling will not be disturbed on appeal unless a clear abuse of discretion is shown. [Citation.]" (*Ray v. Jackson* (1963) 219 Cal.App.2d 445, 454.)

The trial court did not abuse its discretion in refusing to permit Dr. Wickham to testify as a rebuttal witness. It reasonably concluded that her testimony was cumulative and should have been offered during appellants' case-in-chief. During opening statement, appellants' counsel asserted: "We have a new spine surgeon who came to town. Her name is Amy Wickman, and we are going to hear about Amy. They put her on the general orthopedic call and said, 'Nice, Amy, you will get your spine cases through being on the general orthopedic call.' [¶] Baloney. She got nothing. Nothing. Being on the general orthopedical call . . . isn't a substitute for being [on] spine call." Dr. Moelleken testified that Dr. Wickham had wanted to be on spine call, but the hospital informed her that there was no spine call. Dr. Moelleken further testified that Dr. Wickham was on general orthopedic call but had not treated any spine patients.

Dr. Delamarter

Dr. Delamarter is an orthopedic spine surgeon who trained Dr. Moelleken during his residency. Dr. Delamarter is the co-director of the Spine Institute at Cedars-Sinai Hospital in Los Angeles. Appellants' counsel told the court that Dr. Delamarter would testify that he has worked at various hospitals with spine call panels and that this arrangement has been successful. He would also testify that orthopedic spine surgeons such as Dr. Moelleken are fully capable of performing complex spine surgeries. Respondents objected that Dr. Delamarter would present expert testimony, but he was not on appellants' expert witness list. They also objected that Dr. Delamarter's testimony would be cumulative of evidence introduced by appellants in their case-in-chief. In sustaining respondents' objection, the court noted that Dr. Delamarter was "an undisclosed expert."

"The general rule, set forth in Code of Civil Procedure section 2034.300, is that an undesignated expert witness may not testify. An exception to that rule is provided in Code of Civil Procedure section 2034.310, which permits a party to call an undesignated expert witness to testify if the expert has already been designated by another party, or if '[t]hat expert is called as a witness to impeach the testimony of an expert witness offered by any other party at the trial. This impeachment may include testimony to the falsity or nonexistence of any fact used as the foundation for any opinion by any other party's expert witness, but may not include testimony that contradicts the opinion.' (Code Civ. Proc., § 2034.310, subds. (a) & (b).) Trial courts strictly construe the foundational fact requirement in Code of Civil Procedure section 2034.310 'so as to "prevent a party from offering a contrary opinion of his expert under the guise of impeachment." [Citation.]' [Citation.]" (*Tesoro Del Valle Master Homeowners Assn. v. Griffin* (2011) 200 Cal.App.4th 619, 641.)

Appellants sought to call Dr. Delamarter to offer his expert opinion on spine call panels and the ability of orthopedic spine surgeons to perform emergency and trauma spine surgery. Appellants' offer of proof "did not include any testimony designed to establish the falsity or nonexistence of any fact" used as a foundation by respondents'

expert witnesses in forming their opinions. (*Tesoro Del Valle Master Homeowners Assn. v. Griffin*, *supra*, 200 Cal.App.4th at p. 641.) "Because appellants' proffered rebuttal expert testimony failed to satisfy the requirements of Code of Civil Procedure section 2034.310, the trial court properly exercised its discretion in precluding such testimony." (**Ibid**.)

### *Juror Misconduct*

### Juror No. 5

Appellants contend that juror no. 5 committed misconduct because she failed to disclose in a questionnaire that she or someone close to her had had "a seriously negative experience with a doctor." Two jurors declared under penalty of perjury that, during deliberations, juror no. 5 had said that doctors like Dr. Moelleken had mistreated members of her immediate family. Appellants argue that, based upon this misconduct, the trial court erred in not granting their motion for a new trial.

" 'When a party seeks a new trial based upon jury misconduct, a court must undertake a three-step inquiry. The court must first determine whether the affidavits supporting the motion are admissible. [Citation.] (*People v. Bryant* (2011) 191 Cal.App.4th 1457, 1467.) "This, like any issue of admissibility, we review for abuse of discretion. [Citation.]" (*Barboni v. Tuomi* (2012) 210 Cal.App.4th 340, 345.) '[A party] may present evidence of [a juror's] overt acts or statements that are objectively ascertainable by sight, hearing, or the other senses. [Citations.] No evidence may be presented concerning the subjective reasoning processes of a juror . . . . [Citations.]" (*People v. Cissna* (2010) 182 Cal.App.4th 1105, 1116.) "If the evidence is admissible, the court must then consider whether the facts establish misconduct. [Citation.] Finally, assuming misconduct, the court must determine whether the misconduct was prejudicial. [Citations.]" (*People v. Bryant*, *supra*, 191 Cal.App.4th at p. 1467.)

On appeal: "We accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' [Citation.]" (*People v. Collins* (2010) 49 Cal.4th 175, 242.) Whether those facts constitute misconduct is "a legal question we review independently." (**Ibid**., fn. omitted.) A juror generally commits

9.

misconduct when the juror's act "is a direct violation of the oaths, duties, and admonitions imposed on actual or prospective jurors, such as when a juror conceals bias on voir dire, consciously receives outside information, discusses the case with nonjurors, or shares improper information with other jurors . . . . [Citations.]" (*In re Hamilton* (1999) 20 Cal.4th 273, 294.)

The trial court ruled that the declarations of the two jurors were inadmissible. Even if the declarations were admissible, the trial court concluded that "[m]uch of what has been said [in them] was not persuasive . . . ." The court continued: "Even if I were to credit the substance of [the jurors'] declaration[s], the challenged conduct and irregularities do not amount to misconduct [and] were not prejudicial . . . ."

We need not decide whether the declarations of the two jurors were admissible. Assuming without deciding that they were admissible, they were insufficient to establish misconduct by juror number 5. The questionnaire asked if she or someone close to her had had a "*seriously* negative experience with a doctor." (Italics added.) It is reasonable to infer that juror number 5 believed that her immediate family's negative experience was not "serious." The jurors' declarations did not disclose the facts underlying the alleged mistreatment.

In any event, the statements of the two jurors were contradicted by juror no. 5 and seven other jurors, who declared that juror number 5 had never said, or that they had no recollection of her saying, that doctors had mistreated her family. The trial court impliedly credited their declarations, and its determination of credibility is binding on this court. (*People v. Collins*, *supra*, 49 Cal.4th at p. 242.)

Juror No. 5 and the Jury Foreperson

Appellants argue that juror number 5 and the jury foreperson committed misconduct by "introduc[ing] 'facts' that were not in evidence." Appellants' argument is based on declarations by the same two jurors who said that juror number 5 had complained that doctors like Dr. Moelleken had mistreated her immediate family. The two jurors stated: (1) The foreperson and juror number 5 said "that if we voted for Dr. Moelleken then other doctors would start suing to get jobs at the hospitals. They both

10.

kept saying that voting in favor of Dr. Moelleken would set a bad precedent, and that we risked destroying the hospital and driving the neurosurgeons out of work . . . ." (2) The foreperson said a vote for Dr. Moelleken "would affect how the hospitals are run nationally." (3) Juror no. 5 "said Dr. Moelleken is not married because of the way he is and the way he acted."

The two jurors' statements were contradicted by the declarations of eight jurors, including juror number 5 and the foreperson. The trial court impliedly credited the declarations of these eight jurors, and its determination of credibility is binding on this court. (*People v. Collins*, *supra*, 49 Cal.4th at p. 242.)

*Attorney Misconduct*

Appellants contend that the trial court erroneously failed to grant their motion for a new trial because the neurosurgeon respondents' counsel had committed misconduct during opening statement. The misconduct consisted of allegations that appellants wanted a $10,000,000 judgment, which would "break" the neurosurgeons and force them "out of business."

Appellants forfeited this claim of misconduct because they did not timely object or request that the jurors be admonished to disregard counsel's allegations. "Generally a claim of misconduct is entitled to no consideration on appeal unless the record shows a timely and proper objection and a request that the jury be admonished. [Citations.] . . . 'It is only in extreme cases that the court, when acting promptly and speaking clearly and directly on the subject, cannot, by instructing the jury to disregard such matters, correct the impropriety of the act of counsel and remove any effect his conduct or remarks would otherwise have.' [Citation.] In the absence of a timely objection the offended party is deemed to have waived the claim of error through his participation in the atmosphere which produced the claim of prejudice." (*Horn v. Atchison, Topeka and Santa Fe Railway Co.* (1964) 61 Cal.2d 602, 610.)

Appellants did not object to counsel's remarks until the day after he had made them. This was not timely. "Even then [appellants] did not request that the jury be

11.

admonished to disregard the alleged improper statements made by counsel." (*Horn v. Atchison, Topeka and Santa Fe Railway Co.*, *supra*, 61 Cal.2d at 610.)

We recognize "that '[a] [party] will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile.' [Citation.]" (*Duronslet v. Kamps* (2012) 203 Cal.App.4th 717, 727.) But here there is no reason to believe that a timely objection would have been futile. When appellants' objected the following day, the court stated: "[Appellants are] absolutely right. The neurosurgeons aren't going to go broke." Nor is there reason to believe that a timely admonition would have been ineffective to cure whatever harm counsel's remarks had caused.

### Disposition

The judgment is affirmed. Costs to Respondent.

NOT TO BE PUBLISHED.

YEGAN, Acting P.J.

We concur:

PERREN, J.

GRIMES, J.*

 *Assigned by the Chief Justice pursuant to article 6, section 6 of the California Constitution

12.

Thomas Anderle, Judge

Superior Court County of Santa Barbara

_____

Blecher & Collins, Maxwell M. Blecher and Majed Bakak.  Goldenberg, Lowenstein & Weatherwax, Davic W. Kesselman, for Appellants.

Jones Day, Jeffrey  A. Levee, Craig  Stewart. Eris P. Enson and Kate Wallace.  Griffith & Thornburgh, L. Donald Boden, for Respondents.