Filed 7/9/14  LaBerge v. City of Visalia CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DENNIS LABERGE,<br><br>　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>CITY OF VISALIA,<br><br>　　Defendant and Appellant. | F066593<br><br>(Super. Ct. No. VCU227856)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Lloyd L. Hicks, Judge.

Dooley, Herr, Pedersen & Berglund Bailey, Leonard C. Herr, and Ron Statler for Defendant and Appellant.

Law Offices of Richard M. Lester and Michael K. Dekruif for Plaintiff and Respondent.

-ooOoo-

Plaintiff Dennis LaBerge injured his larynx and esophagus when he drove his motorcycle into a nylon rope that had been strung across Mary Avenue at its intersection with Pinkham Road in Visalia, California.  The rope's purpose was to close off Mary Avenue for a Fourth of July block party.  LaBerge sued the City of Visalia (City) for

allowing a dangerous condition to exist at the intersection. The jury found City 35 percent at fault and the trial court entered a judgment in the amount of $106,952.50 against City.

City appealed, contending that (1) the rope was a dangerous condition only after the flags originally attached to it had been removed and (2) there was no evidence the rope had been without flags long enough for City to have been put on constructive notice of the dangerous condition. City also contends a new trial is necessary due to attorney misconduct during closing argument.

The trial court rejected these contentions when it denied City's posttrial motions. The court stated that the jury could have found (1) the rope was a dangerous condition even with two American flags and a sign attached to it and (2) City had constructive notice of the flagged-rope danger because a police officer saw a similar rope barrier at the other entrance to Mary Avenue nearly an hour before LaBerge's accident. As for attorney misconduct, the court stated a new trial was unnecessary because City had objected and the court had sustained the objections and admonished the jury. The trial court relied on the principle that juries are presumed to have followed the court's instructions and admonitions. The court also determined City had not been prejudiced by the misconduct.

We agree with the trial court's reasoning. The judgment is affirmed.

## FACTS

Jesse and Angela Gutierrez, a married couple who lived on Mary Avenue, obtained a temporary street closure permit from City to close East Mary Avenue between Pinkham Road and Cain Street between 5:00 p.m. and 10:00 p.m. on July 4, 2007, for a Fourth of July block party.

Instead of using a type of barricade approved by the City for street closures, the Gutierrezes used ropes. The rope at the Mary Avenue and Pinkham Road intersection was stretched between a street sign and a telephone pole. Attached to each rope was sign

2.

that said: "road closed 5:00 pm to 10 pm." American flags were attached to the rope, one on each side of the "street closure" sign.

George Weaver, a City police officer assigned to patrol in the area was asked to visit the block party for public relations purposes. Officer Weaver did not consider it part of his assignment to conduct a safety inspection. He approached the block party in his patrol car by driving up South Cain Street to its intersection with Mary Avenue. When Officer Weaver arrived at the intersection, he saw the sign and other things hanging from a line across the street. He testified he could see the barrier clearly and that it was obvious. He parked his patrol car on Cain Street at its intersection with Mary Avenue. To approach a group of people at the block party, Officer Weaver ducked under the rope. Officer Weaver stayed at the party for approximately 15 minutes. Because of a bend in Mary Avenue, the intersection of Pinkham and Mary, where LaBerge's accident occurred, was not visible from the intersection of Cain and Mary where the officer visited. Consequently, the officer did not see the rope at the intersection of Pinkham and Mary.

Mrs. Gutierrez took photographs of Officer Weaver with her father and some kids. The camera automatically recorded the time the pictures were taken as 5:51 p.m.

At about 6:45 p.m. on July 4, 2007, LaBerge drove his motorcycle south on Pinkham Road and turned right onto Mary Avenue. While still in his turn, LaBerge hit the rope barrier at a 45-degree angle, which caused his head to be yanked diagonally. The impact did not knock LaBerge off the bike; he was able to bring the bike to a stop.

Before turning, LaBerge had not seen any obstructions of the roadway. After he stopped, LaBerge looked back and saw the rope in the street and the sign on the ground, near the "O" in the word "STOP" that was painted in the south lane of Mary Avenue at the intersection. He did not see any American flags on the rope or in the immediate area.

The impact caused injuries to LaBerge's larynx and esophagus. The full-face Bell helmet LaBerge was wearing provided him some protection.

3.

# PROCEEDINGS

In April 2008, LaBerge filed a complaint against City and the Gutierrezes. LaBerge alleged that the use of the nylon rope to block traffic turning onto to Mary Avenue constituted a dangerous condition and City knew or should have known that the dangerous condition existed. The Gutierrezes were dismissed before trial.

In 2010, the case was tried to a jury. The jury found the City 65 percent at fault, LaBerge zero percent at fault, and all others 35 percent at fault. In addition, the jury found LaBerge's total damages were $310,983.22, including $205,568 for future noneconomic losses such as physical pain and suffering. The court apportioned fault in accordance with the jury's findings and entered a judgment of $206,431.92 against City and in favor of LaBerge.

City moved for judgment notwithstanding the verdict (JNOV) and for a new trial. The trial court denied City's motion for JNOV, but granted a new trial because of insufficient evidence on the issues of liability and apportionment of fault. The trial court allowed the jury's findings regarding the amount of damages suffered by LaBerge to stand.

In December 2011, this court issued a nonpublished decision affirming the trial court's posttrial orders requiring a limited retrial. (*LaBerge v. City of Visalia* (Dec. 29, 2011, F060301) [nonpub. opn.].)

In August 2012, a second jury trial was held. The jury's answers to questions in the special verdict form indicate that the jury found (1) the intersection of Pinkham Road and Mary Avenue was in a dangerous condition at the time of the accident; (2) City had notice of the dangerous condition for a long enough period of time to have protected against it; and (3) City's failure to take sufficient steps to protect against the risk of injury created by the dangerous condition was not reasonable under the circumstances. !(CT 538)! The jury allocated 35 percent of the fault to the City, zero percent to LaBerge, and

4.

65 percent to all others,[1] which would have included the Gutierrezes and any unknown individuals who might have removed the American flags from the rope.

On December 6, 2012, the trial court entered judgment in favor of LaBerge and against City for $106,952.50, based on the second jury's allocation of fault and the first jury's finding on damages.[2]

On December 10, 2012, the trial court filed a written ruling on City's posttrial motions. The court denied the motion for JNOV on the ground that (1) City's argument incorrectly assumed that there would be a dangerous condition only if the rope did not have flags attached to it and (2) the jury could have found that the rope with flags constituted a dangerous condition. The court denied the motion for new trial, concluding that (1) there was constructive notice of the use of a flagged rope; (2) the alleged misconduct was not prejudicial because City made objections that the trial court sustained and the jury was admonished that the law was what the court said, not what the attorneys said; and (3) the apportionment of some fault to LaBerge was not necessary because the jury could have found that the flags were not on the rope when LaBerge turned into it (which was what plaintiff's counsel argued to the jury).

---

[1]    The special verdict form's reference to "all others" must be interpreted to mean the Gutierrezes because the jury was instructed: "If you determine that the City of Visalia is liable to Dennis LaBerge, you will be asked to find the comparative fault of Dennis LaBerge, the City of Visalia, and Angela and Jesse Gutierrez. To find the comparative fault, you must decide the percentage of responsibility for the harm that you attribute to each of them."

[2]    The damages found by the first jury totaled $310,983.22 and 35 percent of this amount equals $108,844.13, which is slightly more than the final judgment. The difference is the result of reductions made by the trial court under *Hanif v. Housing Authority* (1988) 200 Cal.App.3d 635, to account for the fact that certain medical bills were written off by the medical care provider after an insurance company paid less than the full amount billed.

In January 2013, City filed a notice of appeal that referenced the order on the posttrial motions rather than the judgment.

**DISCUSSION**

I.  SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE VERDICT

A. <u>Standard of Review</u>

A party challenging the sufficiency of the evidence to support a jury's verdict faces a difficult task on appeal. (*Horn v. Oh* (1983) 147 Cal.App.3d 1094, 1098.) The party "must show that there is no substantial evidence whatsoever to support the findings of the trier of fact." (*Ibid*.) The substantial evidence test has been described by our Supreme Court as follows:

> "Where findings of fact are challenged on a civil appeal, we are bound by the 'elementary, but often overlooked principle of law, that … the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429.) We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.)

Evidence is "substantial" for purposes of this standard of review if it is reasonable, credible and of solid value. (*Brewer v. Murphy* (2008) 161 Cal.App.4th 928.)

B. <u>Notice and the Length of Time the Dangerous Condition Existed</u>

*1. Contentions of the Parties*

City contends there is insufficient evidence to support the jury's verdict because there was no evidence that the dangerous condition existed for any amount of time before LaBerge drove into the rope. City relies on subdivision (b) of Government Code section 835.2, which provides that a public entity has constructive notice of a dangerous condition "only if the plaintiff establishes that the condition had existed for such a period

of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character."

City argues that "the rope was not dangerous when it had the flags and sign on it" and, therefore, evidence was needed to show how long the flags had been off the rope before LaBerge's accident. City's theory that the rope with flags did not create a dangerous condition is based on its interpretation of LaBerge's testimony at trial. City's opening brief asserts, "Mr. LaBerge testified that the lack of the flags was what made the rope dangerous." Elsewhere, it asserts that LaBerge "conceded that the condition of the rope was not dangerous until the flags came off of it." Similarly, City's reply brief stated: "Mr. LaBerge argues the rope became dangerous when the signs fell off, and that the rope would have been obvious if the signs were on it. That was an admission by Mr. LaBerge."[3]

LaBerge argues that City's interpretation of his testimony "is simply incorrect."

### 2. Trial Court's View of the Purported Concession

The trial court considered City's argument when it decided City's posttrial motions. The trial court disagreed with City's version of LaBerge's testimony, stating that LaBerge "did not so testify." The court stated: "He testified that, if seen head on, the 'barrier' was obvious. He also testified that he did not approach it head on .…" As

---

[3] One telling aspect about City's interpretation of the testimony is that none of the assertions quoted here are supported by a citation to the reporter's transcript where the purported concession occurred. City's omission of a citation violates California Rules of Court, rule 8.204(a)(1)(C), which states that *any* reference to a matter in the record *must* be supported "by a citation to the volume and page number of the record where the matter appears." (See *Sky River LLC v. Kern County* (2013) 214 Cal.App.4th 720, 741 [rule applies to matters referenced at any point in brief, not just the brief's statement of facts]; *Bernard v. Hartford Fire Ins. Co.* (1991) 226 Cal.App.3d 1203, 1205 [citations to a block of pages does not comply with rule].) An important purpose of this rule is to assure that the assertions made by appellate practitioners accurately reflect the proceedings below. Had City followed the rule in this appeal, its version of what happened at trial might have been more accurate.

an alternate ground for rejecting City's argument, the court stated that the question of whether a dangerous condition existed was a finding for the jury based on all the evidence and the jury was not bound to credit only LaBerge's testimony.

    *3.    LaBerge's Testimony Was Not a Concession*

On cross-examination by City's lawyer, LaBerge testified that (1) he saw no obvious obstruction and (2) if there had been an American flag and sign on the rope across Mary Avenue he would have seen it.  The cross-examination then proceeded as follows:

> "Q.    And you would agree with me that this sign and this flag, especially if there were two flags, this is a fairly obvious obstruction, correct?
>
> "A.    Yes.
>
> "Q.    Okay.  So if this was on a rope strung across the road, you would agree with me that it should be fairly obvious, correct?
>
> "A.    I don't think so.
>
> "Q.    Okay.  I must have misunderstood what you just told us.  This sign and this American flag, especially if there are two flags, if they were across a road, do you believe it would be a fairly obvious obstruction?
>
> "[Plaintiff's Counsel]:    Incomplete hypothetical.
>
> "THE COURT:    Overruled.
>
> "[LaBerge]:    If they're directly in front of me, yes.
>
> "[Defense Counsel]:  What if they're on the side of you.  What if – let's say they're over on the side.  Can you see them on the side?
>
> "A.    I can see them on the side, but this wouldn't be the angle they were to my approach."

The foregoing questions and answers are reviewed by this court under the substantial evidence rule, which means that we view the testimony in the light most

8.

favorable to LaBerge and draw all reasonable inferences and resolve all conflicts in favor of him. (*Jessup Farms v. Baldwin*, *supra*, 33 Cal.3d at p. 660.)

Under this standard, we agree with the trial court and conclude that LaBerge did not concede (1) that the rope strung across Mary Avenue constituted a dangerous condition only if it did not have flags and a sign attached or (2) that a rope with flags and a sign attached would have been obvious to someone who approached it from the north on Pinkham Road.[4] LaBerge's answers, which included "I don't think so" and "but this wouldn't be the angle they were to my approach," cannot reasonably be construed as the concession or admission claimed by City.

The purported concession by LaBerge is the basis for City's argument that there was no evidence showing how long the dangerous condition existed and, therefore, LaBerge failed to establish a fact essential to his constructive notice theory. Because City has failed to establish LaBerge conceded the rope strung across Mary Avenue constituted a dangerous condition only if the flags were removed, City's argument that the evidence was insufficient to prove constructive notice of the dangerous condition must fail.

Stated from another perspective, the evidence supports a finding by the jury that the nylon rope, even with flags and a road-closed sign attached, constituted a dangerous condition when strung across Mary Avenue at its intersection with Pinkham Road. That evidence includes (1) the photographic exhibits of the intersection, (2) the rope and flags used in the courtroom during the cross-examination of LaBerge, and (3) the conditions imposed by City when it issued a temporary street closure permit. Paragraph (D) of the conditions stated:

---

**4** LaBerge approached the rope barrier from the north on Pinkham Road before he turned right onto Mary Avenue.

9.

"Standard barricade with 'Street Closed to Thru Traffic' signs must be placed across the streets at each intersection of the designated closure. The permittee will be held responsible for meeting this requirement. The required barricades and signs will not be furnished by the City, but can be rented from the following companies."

The evidence also supports the jury's "yes" answer to the following question in the special verdict form: "Did the city of Visalia have notice of the dangerous condition for a long enough period of time to have protected against it?" A sufficient time for constructive notice existed in this case because, nearly an hour before LaBerge's accident, a police officer saw the rope barrier being used at the intersection of Mary Avenue and Cain Street. The officer, who knew Mary Avenue had an intersection with Pinkham Road and saw people milling about in the street without any vehicular traffic, should have realized that the Mary and Pinkham intersection was blocked and that a similar, noncompliant barrier had been used.

### C. Reasonable Inspection

City also contends that there was no evidence from which a jury could have determined that a reasonable inspection would have discovered the dangerous condition. This argument fails for the same reason the argument that there was insufficient time for constructive notice failed—both arguments are predicated on a dangerous condition existing only if the rope did not have flags attached. Because we must infer the jury found the nylon rope with the American flags and sign attached constituted a dangerous condition, we reject this argument.

## II. ATTORNEY MISCONDUCT

As an alternative to City's argument for entry of judgment in its favor based on the insufficiency of the evidence, City argues it is entitled to a new trial because of misconduct by LaBerge's attorney.

10.

A.     Rules of Law Concerning Appellate Review of Attorney Misconduct

1.     *Procedural Context*

City included its claims of misconduct by LaBerge's attorney in a motion for a new trial. The trial court denied the motion in a written ruling filed on December 10, 2012. City's notice of appeal stated that City appealed from an order entered on December 10, 2012, which was an "order after judgment under Code of Civil Procedure section 904.1(a)(2)."

"An order denying a motion for new trial is nonappealable. [Citation.] Such an order, however, may be reviewed on appeal from the underlying judgment. [Citations.]" (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 18.) Consequently, we interpret City's notice of appeal as referring to the judgment entered on December 6, 2012.

In the procedural context of an appeal from a judgment, appellate courts analyze attorney misconduct claims at three levels. First, is the claim reviewable on appeal—that is, has the issue been preserved for appellate review and, if not, does an exception apply? Second, was there attorney misconduct? If the appellant clears these two hurdles, then the court reaches the third level and considers whether the misconduct was prejudicial.

2.     *Reviewability of Attorney Misconduct Claims*

As a general rule, "a claim of misconduct is entitled to no consideration on appeal unless the record shows a timely and proper objection and a request that the jury be admonished. [Citations.]" (*Horn v. Atchison*, *T. & S. F. Ry. Co.* (1964) 61 Cal.2d 602, 610 (*Horn*).) The purpose of this two-pronged requirement is to give the trial court the opportunity to admonish the jury, instruct counsel and forestall the accumulation of prejudice by repeated improprieties, thus avoiding the need for a retrial. (*Ibid.*)

The general rule is subject to exceptions. For example, a challenge to alleged misconduct is not forfeited for purposes of appeal by the lack of an objection and request for an admonition when the misconduct is of so aggravated a character that it could not

11.

be cured by any instruction. (*Whitfield v. Roth* (1974) 10 Cal.3d 874, 892.)[5] Also, as to the request-for-admonition prong, the absence of such a request will be excused if the trial court immediately overrules the objection to the alleged attorney misconduct and, as a result, the objecting attorney had no opportunity to make such a request. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 795 (*Cassim*).)

City's appellate brief does not acknowledge the existence of the general rule that establishes the prerequisites for reviewability and, similarly does not mention any exceptions to the general rule. Consequently, as will be discussed in more detail below, City has made no attempt to demonstrate that the instances of alleged misconduct to which City did not object fall within an exception.

### 3. Misconduct

Once it is shown that a misconduct claim is reviewable, the appellate court proceeds to the question whether attorney misconduct actually occurred.

Neither City nor LaBerge contend that an appellate court should defer to a trial court's determination regarding the existence of misconduct. In the present case, the trial court's written ruling stated: "There was attorney misconduct." The court did not specify which of the challenged actions constituted misconduct and which, if any, did not. Because there are no specific determinations, we will independently decide, where necessary, whether a particular challenged action constitutes attorney misconduct. Our independent review is straightforward—we will examine the reporter's transcript to determine what LaBerge's attorney said in front of the jury and will consider those

---

[5] In other words, the general rule does not apply "where there are flagrant and repeated instances of misconduct," and it is clear from the record that objecting and asking for admonitions would have overemphasized the objectionable material and would have alienated the jury. (*Simmons v. Southern Pac. Transportation Co.* (1976) 62 Cal.App.3d 341, 355.)

12.

statements in the context created by the testimony, the jury instructions, and the questions in the special verdict form.

A general definition of attorney misconduct was set forth by the California Supreme Court in *People v. Chojnacky* (1973) 8 Cal.3d 759. Attorney misconduct is "'a dishonest act or attempt [by an attorney] to persuade the court or jury, by use of deceptive or reprehensible methods.'" (*Id*. at p. 766.)

This general definition of misconduct rarely gets directly applied because many published opinions have identified specific types of misconduct. For example, it is misconduct (1) to suggest facts not in evidence, (2) to suggest the jurors should measure damages by what they would take to endure plaintiff's suffering, (3) to accuse defense counsel of suborning perjury or withholding evidence, and (4) to compare the wealth of the defendant and plaintiff. (See *Sabella v. Southern Pac. Co.* (1969) 70 Cal.2d 311, 325-326 [dis. opn. of Traynor, J.].) Guide books have summarized the appellate decisions and generated lists of matters that have been recognized as attorney misconduct in the context of closing argument. (E.g. Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2013) ¶¶ 13:59 to 13:214, pp. 13-13 to 13-50.1; Cal. Judges Benchbook: Civil Proceedings Trial (CJER 1997) Conduct and Control of Trial §§ 5.74-5.81, pp. 243-245 [types of misconduct during closing argument].) Our independent inquiry into whether attorney misconduct occurred in this case will be guided by the precedent that has identified specific types of misconduct.

### 4. *Prejudice*

The third and last level of inquiry into a claim of attorney misconduct concerns whether the appellant has demonstrated that the misconduct was prejudicial. (Cal. Const., art. VI, § 13 [reversal only if error resulted in a miscarriage of justice]; *Cassim*, *supra*, 33 Cal.4th at p. 800; *Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 149.)

City's appellate briefing does not address the standard of review applicable to the question of prejudice. LaBerge contends that the reviewing court makes an independent determination as to whether the attorney misconduct was prejudicial, which requires the court to examine the entire case, including the evidence adduced, the instructions delivered to the jury, and the entirety of the attorney's arguments to the jury.

In *City of Los Angeles v. Decker* (1977) 18 Cal.3d 860 (*Decker*), the California Supreme Court stated that appellate courts are required to review the entire record, including the evidence, and "make an independent determination as to whether [the attorney misconduct] was prejudicial." (*Id.* at p. 872.) The test for prejudice is whether it was reasonably probable that the jury would have arrived at a verdict more favorable to the moving party in the absence of the attorney misconduct. (*Ibid.*; see *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574 [standard for reversible error in civil case].)

Although appellate courts bear the responsibility of making an independent determination on the question of prejudice, they do not ignore the trial court's determination of that issue. In *Cope v. Davison* (1947) 30 Cal.2d 193 (*Cope*), the California Supreme Court considered the question of prejudice resulting from attorney misconduct in a case where the trial court had denied a motion for new trial and stated:

> "A trial judge is in a better position than an appellate court to determine whether a verdict resulted wholly, or in part, from the asserted misconduct of counsel and his conclusion in the matter will not be disturbed unless, under all the circumstances, it is plainly wrong." (*Id.* at p. 203.)

Despite our Supreme Court's adoption of the independent review standard for the question of whether prejudice resulted from the attorney misconduct, it appears the principle adopted in *Cope* remains good law. (See *Sabella v. Southern Pac. Co.*, *supra*, 70 Cal.2d at p. 318, fn. 5; *Joyce v. Simi Valley Unified School Dist.* (2003) 110 Cal.App.4th 292, 306; *West v. Johnson & Johnson Products, Inc.* (1985) 174 Cal.App.3d 831, 863.) Therefore, we will treat the trial court's determination that there was no

prejudice as one of the factors our independent review must consider. (*Dominguez v. Pantalone* (1989) 212 Cal.App.3d 201, 211, fn. 2.)

B.        References to a Nonexistent Duty to Inspect

City contends that LaBerge's attorney made 16 references during his closing argument to a nonexistent duty to inspect, which included a statement telling the jury they got to decide if City had a duty or not.

*1.        Background Regarding an Inspection System*

The topic of inspections arose in this case because of the statutory definition of constructive notice in subdivision (b) of Government Code section 835.2, which mentions an inspection system in connection with its description of due care:

> "A public entity had constructive notice of a dangerous condition within the meaning of subdivision (b) of Section 835 only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character. On the issue of due care, admissible evidence includes but is not limited to evidence as to:

> "(1) Whether the existence of the condition and its dangerous character would have been discovered by an *inspection system* that was reasonably adequate (considering the practicability and cost of inspection weighed against the likelihood and magnitude of the potential danger to which failure to inspect would give rise) to inform the public entity whether the property was safe for the use or uses for which the public entity used or intended others to use the public property and for uses that the public entity actually knew others were making of the public property or adjacent property.

> "(2) Whether the public entity maintained and operated such an *inspection system* with due care and did not discover the condition."
> (Italics added.)

In view of this statutory provision, the trial court used CACI Nos. 1104 and 1112 to instruct the jury on an inspection system and the reasonableness of City's action. As read to the jury, those instructions provided:

15.

"In deciding whether City of Visalia should have discovered the dangerous condition, you may consider whether it had a reasonable inspection system and whether a reasonable inspection system would have revealed the dangerous condition.

"In determining whether an inspection system was reasonable, you may consider the practicality and cost of the system and balance those factors against the likelihood and seriousness of the potential danger if no such system existed.

"A public entity is not responsible for harm caused by a dangerous condition if its failure to take sufficient steps to protect against the risk of injury was reasonable.

"If the City of Visalia proves that its conduct was reasonable, then your verdict must be for the City. In determining whether the City of Visalia's conduct was reasonable, you must consider how much time and opportunity it had to take action. You must also weigh the likelihood and the seriousness of the potential injury against the practicality and cost of protecting against the risk of injury."

These instructions were followed by an instruction about jury deliberation and then there was a break, before the parties presented closing arguments to the jury.

After closing arguments, the jurors were presented with a special verdict form that required them to decide whether City acted reasonably under the circumstances. The jury answered "No" to the sixth question, which asked:

"When you consider the likelihood and seriousness of potential injury, compared with (a) how much time and opportunity the City of Visalia had to take action, and (b) the practicality and cost of protecting against the risk of injury, was the City of Visalia's failure to take sufficient steps to protect against the risk of injury created by the dangerous condition reasonable under the circumstances?"

The foregoing instructions and question in the special verdict form provide the basis for LaBerge's attorney discussion of (1) inspection and (2) the weighing of cost and risk.

16.

## 2. *Record of Argument and City's Objections*

City contends LaBerge's attorney encouraged the jury to find that City was under a duty to inspect by stating: "[Officer Weaver] should have realized that there is probably another road closure."

The next statements by LaBerge's attorney that City contends involve a duty to inspect are as follows:

"[LaBerge's counsel:]  It is the City's job to maintain the traffic in a safe manner.  That's traffic and safety.  And they can't just say, oh, we want the community to have fun, let's not worry about the risk.  You folks on this issue are the ones who decide the policy for the City of Visalia.  You need to tell them if it is appropriate to just say don't worry about the risks, let's party, or basically, by your verdict, let them know that you need to impose a minor fee on a permit to make sure.

"[Defense counsel]:  Your Honor, I object.  That's not the function of the jury in this case.

"THE COURT:  That's sustained.

"[LaBerge's counsel]:  You are the decision makers.

"THE COURT:  But they're not to impose a fine or a fee.   That's improper.

"[LaBerge's counsel]:  No.  You decide whether or not the City should have an inspection system.  And you know ---

"[Defense counsel]:  Your Honor, I object.  They're not going to decide if we should have an inspection system.

"THE COURT:  That is correct.  Sustained.  You follow the instruction, which is 1104, which you'll hear and can look at.  You're not deciding whether the City should now have an inspection system.

"[LaBerge's counsel]:  Folks, we know we're talking about July 2007.  The question is whether or not in July 2007 the City should have had an inspection system in place.  [¶]  I submit to you that they absolutely should have.  And the evidence shows you that it could have been done at very minimal cost to the people who wanted to have block parties.…  [¶] … [¶] … If [City] had done what was right, we wouldn't be here, and Mr. LaBerge would be whole.  The inspection system is designed to protect

17.

the entire community.  Not just motorcyclists.  Not just middle-aged men. Children, infants, kids, the entire age spectrum.  Everybody you know who lives, works, or visits Visalia.  That is their failure.  [¶] You need to confirm that the City needs to be more careful.”

Counsel for City made no further objections before LaBerge’s counsel ended the opening portion of his closing argument and the proceedings broke for lunch.  After the lunch break, outside the presence of the jury, counsel for City made another objection and requested the jury be admonished.  Counsel for City asserted:

> “[LaBerge’s counsel’s] last five minutes of closing argument was all about duty.  City of Visalia had a duty to have an inspection system and they should have charged and they could have gotten money and they could have had an inspection system and avoided all of this or words to that effect.
>
> “He did not tie that at all to what the law is.  And the inspection system only goes to whether we would have reasonably had notice of this dangerous condition.  So I very much object.  I had to get up and object more than I ever have in any closing argument.  And I think it was very prejudicial to the City that I had to keep doing that.
>
> “And when [LaBerge’s counsel] is telling them to rely on what you know to be appropriate barricades and then starts talking about duty again, I think it’s inappropriate, and I’d ask that the jury be admonished.”

The trial court responded to the objection and request for the jury to be admonished by stating:

> “I think there was plenty of admonishment going on.  And I’ve made some notes.  He was very, very close to the duty question, but with 1104, which requires – it says they can consider whether there was a reasonable inspection system and whether a reasonable system would have revealed it.
>
> “Then they say you can consider the practicality and cost of the system, balanced against the factors and the likelihood and seriousness of the danger.
>
> “So he is able to argue here’s what the factors are, and here’s the things you’re looking at, as to whether they should have an inspection system.  He can’t argue and he didn’t actually explicitly say they have a

18.

duty to inspect.  The argument was in the context of 1104 that they should find that they should have had an inspection system under 1104.  [¶] … [¶]

"… That's – yeah.  It was real, real close.  But I think it was enough to fit under that, and you can clarify it under that.  Anything else?"  !(RT 439:4-25)!

City's opening brief also lists nine statements made by LaBerge's counsel in his rebuttal argument that City contends were inappropriate because they encouraged the jury to conclude that City had a duty to inspect.  City made no objection to any of those statements at the time.  Furthermore, City's appellate briefing has not addressed, much less demonstrated, that the failure to object and request a curative admonition was justified.  Consequently, we conclude that City's misconduct claims regarding the statements during the rebuttal argument[6] are not subject to review on appeal.  (*Horn*, *supra*, 61 Cal.2d at p. 610.)

### 3. Reviewability of Claims

City's claim that the statement that Officer Weaver "should have realized that there is probably another road closure" constitutes misconduct was not raised during closing argument.  City did not object to this argument at the time.  Furthermore, City has not argued it should be excused from the requirement of an objection and request for admonition because an exception to the general rule applies.  Therefore, we conclude City's claim that the statement constitutes attorney misconduct is not subject to appellate review—that is, it is forfeited or deemed waived.  (*Horn*, *supra*, 61 Cal.2d at p. 610.)  Moreover, the statement was permissible because it addressed constructive notice, an important issue in the case.

---

**6** Like the earlier arguments, none of the statements used the phrase "duty to inspect" or even the word "duty."

The next six statements challenged by City are set forth above in the quotes from LaBerge's attorney's closing argument. We conclude that City's two objections during argument and its objection and request for an admonition outside the presence of the jury sufficiently preserved for appeal the claim that those statements constituted misconduct.

### 4. *Existence of Attorney Misconduct*

LaBerge's attorney's statements that (1) the jurors "are the ones who decide the policy for the City of Visalia"; (2) the jurors should let City know it needs to impose a minor fee on permits; and (3) the jurors "decide whether or not the City should have an inspection system" are misstatements of law regarding the jury's role, and, therefore, constitute misconduct. (Wegner et al., Cal. Practice Guide: Civil Trials and Evidence, *supra*, ¶ 13:78, p. 13-17 [misstating the law].)

During the trial, the court concluded these remarks were inappropriate, sustained City's objections, and admonished the jury it was not to impose a fee or fine and it was not deciding whether "City should *now* have an inspection system." (Italics added.)

After the trial court's correction regarding timing, LaBerge's attorney's stated: "The question is whether or not in July 2007 the City should have had an inspection system in place." City also contends this was a misstatement of law. We disagree.

Counsel's argument did not tell the jury that a duty to inspect exists. Instead, it summarized two questions in the jury instruction about inspections. Specifically, that instruction stated: "In deciding whether City of Visalia should have discovered the dangerous condition, you may consider *whether it had a reasonable inspection system* and *whether a reasonable system would have revealed the dangerous condition*." LaBerge's attorney's statement, when placed in the context of the evidence about City having no inspection system, suggested to the jury that it would have been reasonable to have an inspection system in 2007 and such a system would have revealed the dangerous

condition. This is an argument the attorney was justified in making under the instructions and evidence presented.

Similarly, other arguments and statements challenged on appeal do not explicitly state that City had a duty to inspect. While it is possible to interpret those statements as *implying* such a duty existed, it also is possible to interpret those statements as argument requesting the jury to find that City, by not having an inspection system, failed to exercise due care. Rephrased in terms of the sixth question in the special verdict form, City's lack of an inspection system was a "failure to take sufficient steps to protect against the risk of injury created by the dangerous condition [that was not] reasonable under the circumstances." From this perspective, the argument that City should have had an inspection system was not misconduct. Indeed, if LaBerge's counsel had not addressed the question in CACI No. 1104 about "whether a reasonable [inspection] system would have revealed the dangerous condition," he would have been omitting argument on an issue explicitly presented to the jury by the instructions and properly subject to criticism.

### 5. *Demonstration of Prejudice*

City argues that the prejudice from LaBerge's attorney's repeated mischaracterizations of the law and the jury's role was patent and asserts the jury would have felt compelled to find for LaBerge despite the evidence presented.

First, our determinations regarding which of City's claims are reviewable has led to the conclusion that only instances of reviewable misconduct concerning the jury's role regarding a duty to inspect are the three instances where City objected and the trial court sustained the objections. Thus, the reviewable misconduct before us is significantly narrower than that claimed by City.

21.

Second, City's argument does not address (1) the curative effect of the trial court's admonitions to the jury; (2) the questions posed in the jury instructions about inspections; and (3) the six sequential questions in the special verdict form that take the jury step by step through the issues that they were to decide, which would have kept the jury on course and prevented them from wandering far afield into irrelevancies. Similarly, City's argument does not address the trial court's determination that there was no prejudice from the misconduct.[7] (See *Cope*, *supra*, 30 Cal.2d at p. 203.) When the few instances of misconduct are considered in this context, we (like the trial court) conclude that City has not shown prejudice.

C.      Encouraging Jurors to Impose a Duty to Tax

City contends that LaBerge's attorney encouraged jurors to impose a duty to tax. City's opening brief includes the following argument:

> "The imagined duty to tax was openly argued despite the apparent non-existence of any such duty: '[w]e deserve better. And we're not talking about charging people a thousand dollars to have a party, 500 dollars. We're saying just throw in 10, 15, 20 bucks to pay someone who knows what to look for to ensure that you've done it right,' (RT 469) and he continues on with '[e]specially when the risk of substantial injury or death can be avoided by just telling the folks who want to have a block party, okay, but you're going to have to pay 10, 15, 20 bucks for the cost of an inspection,' (RT 473)."

First, City's citations to the record do not show that City objected to the purported misconduct or requested the jury be admonished.

---

[7]      In its written ruling on the posttrial motions, the trial court stated: "There was attorney misconduct. However, it was objected to, the objections were sustained, and the jury was admonished that the law was what the Court said, and not what counsel said. It is presumed that the jurors followed their instructions. [¶] Furthermore, the Court cannot find that the misconduct contributed to the verdict. The jury's verdict was more favorable to the City than the previous jury."

22.

Second, City has not demonstrated attorney misconduct. In characterizing LaBerge's attorney's arguments about how charging a small fee could cover the cost of inspection as encouraging the jurors to impose a duty to tax, City has not addressed how the arguments related to the jury instruction based on CACI No. 1104, which provides in part: "In determining whether an inspection system is reasonable, you may consider the practicality and cost of the system …." In addition, the jury was instructed that it "must also weigh the likelihood and the seriousness of the potential injury against the practicality and cost of protecting against the risk of injury."

It appears that LaBerge's attorney's reference to a fee of $10 to $20 was his view as to the conclusion the jury should draw from the evidence about the cost of protecting against the risk of injury created by improper barricades. Such an argument was within the wide latitude given to attorneys in closing argument and, thus, we conclude that there was no misconduct shown. (*Cassim*, *supra*, 33 Cal.4th at p. 795 [during closing argument, attorneys have wide latitude to discuss the case].)

D.     Ad Hominem Attacks

City also contends that LaBerge's attorney "attempted to gain unfair advantage through *ad hominem* attacks on City's legal counsel with leading questions to Mrs. Gutierrez, accusing City's attorney of twisting her words, implying that City and its agents are liars without admissible evidence of any such proclivities."

This claim of misconduct is not supported by citations to the record. As a result, it is difficult for this court to determine exactly which statements or questions by LaBerge's attorney constituted the personal attack on City's lawyer. We have reviewed the exchanges that occurred in connection with the presentation and proper interpretation of Mrs. Gutierrez's deposition testimony and do not believe the transcript demonstrates such an attack.

23.

Moreover, the result of the exchange defined Mrs. Gutierrez's position for the jury in a way that was easy to understand. Specifically, Mrs. Gutierrez testified that (1) she was not positive that she had seen the page concerning barricades that is usually provided by City when it issues a permit for a street closure; (2) she did not believe that she had received that page; and (3) she did not believe there was a real chance it was given to her. Mrs. Gutierrez stated: "I couldn't tell you positively that I had received it. I couldn't tell you positively that I had not received it. It wasn't a commitment I was willing to make [either way]."

It does not appear that the jury was confused, misled or impassioned by LaBerge's attorney's examination of Mrs. Gutierrez about her deposition testimony. Indeed, it appears that the jury decided in favor of City on this point and found that City provided the Gutierrezes with the page that contained the paragraph about appropriate barricades because the jury found the Gutierrezes' fault was nearly twice as great as City's. This finding supports the inference that the jury found the Gutierrezes were negligent in not following the instructions provided with the permit. Therefore, City has not demonstrated that any ad hominem attack that might have been implied in the questions and statements of LaBerge's attorney caused any prejudice.

Finally, the argument from City's appellate brief, quoted above, could be viewed as a contention that it is misconduct for an attorney to imply a witness was untruthful when there has been no admissible evidence that the witness has a proclivity for lying. If City is asserting such an argument, it has provided no legal authority to support such a proposition. In view of the fact that the jury instruction listing the factors that a jury could consider in deciding whether to believe a witness did not mention evidence of a proclivity for lying, we conclude City has not demonstrated that the challenges to the credibility of its employee-witness was misconduct.

24.

E.    Appeals to Passions and Prejudice—Safety and Saving Lives

City contends the misconduct of LaBerge's attorney includes attempts to excite and exploit the passions and prejudices of the jury. City contends the attorney "argued, of all things, that the City is killing people because there is no inspection system for block parties."

### 1.    *Record of the Closing Argument*

During closing argument, LaBerge's attorney referred to the granting of permits for road closures and the risk of harm if a road closure is done improperly. He then stated:

> "And, you know, it is nice to support a sense of community in communities. But, ladies and gentlemen, I would hope that the lives of your children, your family, all your loved ones and yourself, I hope that you would value them."

Counsel for City objected to this argument as an appeal to the sympathy of the jury and the court sustained the objection.

LaBerge's attorney continued by telling the jury that they were the ones who decide whether City made errors and caused the problem by failing to have an adequate inspection system, which triggered the following exchange.

> "[LaBerge's Counsel]: And when you determine whether or not there was an adequate system of inspection, you have to consider the risks and the – risk benefit analysis. And what I am saying is the lives of you and your families --
>
> "[City's Counsel]: Your Honor --
>
> "[LaBerge's Counsel]: Your neighbors –
>
> "[City's Counsel]: Could we – I object again.
>
> "THE COURT: Sustained.
>
> "[LaBerge's Counsel]: The lives of the people in this community --
>
> "THE COURT: There you go.

25.

"[LaBerge's Counsel]: Are – if they are at risk because of a recreational, unnecessary road closure, there's no risk benefit analysis. You don't need to make one. Just stating the proposition says that's wrong. [¶] But you want to have block parties. You want to have a sense of community, you impose a 10- or 15-dollar fee on a permit so there's no expense on the City. You can have a block party, you can come up with the 15 bucks. So there's no expense to the City. And we know that everyone in the community is going to be safe."

LaBerge's attorney then stated that the risk of an improper and unsafe road closure could result in an injury to the person approaching the closure or to the persons behind the barricade.

"[LaBerge's Counsel:] [When] the person driving approaches an inappropriate road closure, he doesn't have adequate warning, notice. He doesn't see it. They go through it, and they hit the people this road closure is supposed to protect. We've had instances where six and seven people have died at a time because of that.

"[Defense Counsel]: Your Honor. I'd object and ask that Counsel be admonished.

"THE COURT: You are admonished. I've told you repeatedly do not bring up what you purport to be facts that are not evidence in this case. The jury should disregard these comments by Counsel.

"[LaBerge's Counsel]: General knowledge, sir.

"THE COURT: That is not general knowledge, sir. Stick to the evidence in this case."

After the trial court's direction, LaBerge's attorney moved to another topic and began discussing the lack of credibility of Detective Scott Nelson, who testified about his investigation into LaBerge's collision with the barrier.

2.      *Reviewability*

City objected to the arguments made by LaBerge's attorney and the trial court directed the jury to disregard comments by counsel regarding purported facts that were not in the evidence. Therefore, we conclude that City preserved this claim of misconduct for appellate review.

26.

### 3. *Existence of Attorney Misconduct*

We conclude that the statements made by LaBerge's attorney about valuing the lives of loved ones and people dying because of improper road closures were clear instances of attorney misconduct.

First, the request by LaBerge's attorney that the jurors value their own lives and the lives of loved ones is an appeal to the jurors' self interest. "An attorney's appeal in closing argument to the jurors' self-interest is improper and thus is misconduct because such arguments tend to undermine the jury's impartiality." (*Cassim*, *supra*, 33 Cal.4th at p. 796.) Under this principle, LaBerge's attorney engaged in misconduct when he requested that jurors' value their own lives and the lives of loved ones.

Second, LaBerge's attorney's reference to "where six and seven people have died at a time" is not supported by any evidence in the record. In conducting closing argument, counsel "'may not assume facts not in evidence .…'" (*Cassim*, *supra*, 33 Cal.4th at p. 796; see *Malkasian v. Irwin* (1964) 61 Cal.2d 738, 747 [no doubt that to argue facts not justified by the record is misconduct].) Therefore, we conclude that the reference to people dying from improper road closures constitutes attorney misconduct.

### 4. *Demonstration of Prejudice*

City must demonstrate the misconduct caused prejudice to obtain a reversal of the judgment. (*Cassim*, *supra*, 33 Cal.4th at p. 800.)

City argues that various instances of misconduct "add up to specious arguments designed to confuse." City also asserts that LaBerge's attorney "turned our State's courts into a bully pulpit to confuse the jury on both the law and their role as jurors."

City appellate briefs do not address the effect of the trial court's ruling and its admonition to the jurors. The trial court sustained the objections to LaBerge's attorney's reference to the jurors' own lives and the lives of their family. When the attorney referred to the lives of people in the community, the trial court did not wait for another objection. Instead, the court corrected the attorney by saying: "There you go." As to the

27.

reference to "instances where six and seven people have died at a time," the trial court sustained City's objection, admonished LaBerge's attorney not to bring up purported facts that are not in evidence, and directed the jury to disregard the comment.

Another factor relevant to the analysis of prejudice is the trial court's determination that it could not find the misconduct contributed to the verdict. City has not addressed this factor and shown the trial court was "plainly wrong." (*Cope*, *supra*, 30 Cal.2d at p. 203.)

On balance, it does not appear to this court that the jurors ignored the trial court's admonition during closing argument and the various jury instructions[8] and allowed themselves to be swayed by counsel's appeal to their self-interest and passions. Rather, the jury apportioned nearly two-thirds of the fault to the Gutierrezes and found on 35 percent of the fault attributable to City's failure to exercise due care—a result which does not suggest passion ruled their deliberations. We conclude that City did not demonstrate prejudice tainted the verdict from the second trial.

F.     Purported Arguments Regarding Actual Notice

City contends that LaBerge's attorney argued that there was *actual* notice of the condition despite the trial court's prior ruling that there was no actual notice. We reject this argument because it is not supported by the record.

1.     *City's References to the Record*

City has supported its position that LaBerge's attorney repeatedly argued there was actual notice with two references to the record. To assure City's position is stated accurately here, we quote from City's opening brief:

---

**8**     The jury was instructed that statements and argument by the attorneys were not evidence. In addition, special jury instruction No. 3 stated: "Arguments of the attorneys are not evidence of how you should apportion liability. [¶] Your award must be based on your reasoned judgment and the other evidence that has been admitted during the trial."

"Early in his argument, [LaBerge's attorney] stated that the City had actual notice of the rope at Mary and Pinkham because Officer Weaver saw the rope at Mary and Cain: 'he is an employee of city. I believe in the instructions you will be told that a city – that notice to an employee is how a city achieves notice.' (RT 419.)"

City's second reference to the record to support its position that LaBerge's attorney argued actual notice is contained in the following sentence from its opening brief:

"[LaBerge's attorney] backed that up later when he argued that '[i]t defies reason for anyone to look at one end of the road closure and assume that the other side of a road closure would be done differently. So they had notice.' (RT 468.)"

Based on these statements during closing argument, City contends the jury was inappropriately led to believe that Officer Weaver seeing the rope at Mary Avenue and Cain Street was notice to City of the rope at Mary Avenue and Pinkham Road.

2.      *Counsel's Use of the Term "Notice"*

We have reviewed the portions of closing argument quoted by City and the material surrounding those quotes.

First, nowhere did LaBerge's attorney use the term "actual notice." Thus, City position about repeated references to *actual* notice is not supported by the words that appear in the reporter's transcript.

Second, it appears that City believes each mention of "notice" by LaBerge's attorney was interpreted by the jury to mean actual knowledge. City's argument implies that LaBerge's attorney was obligated to use the term "constructive notice" in his arguments to the jury to avoid misleading them.

City's argument raises the following question: What did the jury think counsel meant when he used the term "notice"? Our inquiry is relatively short because the jury was instructed on this point. Specifically, the trial court used a modified version CACI No. 1103 to instruct the jury on the notice requirement under Government Code section

29.

835.2.**[9]** While the form instruction covers both actual and constructive notice, the instruction given to the jury in this case was modified to address only the should-have-known aspect of notice:

> "Dennis LaBerge must prove that City of Visalia had notice of the dangerous condition before the incident occurred. To prove that there was notice, Dennis LaBerge must prove: [¶] That the condition had existed for enough time before the incident and was so obvious that the City of Visalia reasonably should have discovered the condition and known that it was dangerous."

In view of this jury instruction, we cannot conclude that the jury would have interpreted LaBerge's attorney use of the term "notice" to mean actual knowledge. Furthermore, because the jury instructions did not use or define the term "constructive notice," it would have been confusing for LaBerge's counsel to qualify each of his references to notice with the term "constructive." Therefore, we conclude that the use of the word "notice" by LaBerge's attorney in closing argument does not constitute attorney misconduct in this case and did not confuse or mislead the jury.

Accordingly, City's argument about opposing counsel's repeated references to actual notice fails because there were no such references.

---

**[9]**     Subdivision (a) of Government Code section 835.2 defines actual notice of a dangerous condition to mean the public entity "had actual knowledge of the existence of the condition and knew or should have known of its dangerous character."

Subdivision (b) of Government Code section 835.2 states a public entity has constructive notice of a dangerous condition "only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character."

30.

## DISPOSITION

The judgment is affirmed.  Respondent shall recover his costs on appeal.

_____
Franson, J.

WE CONCUR:

_____
Levy, Acting P.J.

_____
Cornell, J.